# DAVIS v. BEASON.

## APPEAL FROM THE THIRD JUDICIAL DISTRICT COURT OF THE TERRITORY OF IDAHO.

No. 1261. Argued December 9, 10, 1889. — Decided February 3, 1890.

The provision in § 501, Rev. Stats. Idaho, that "no person who is a bigamist or polygamist, or who teaches, advises, counsels or encourages any person or persons to become bigamists or polygamists, or to commit any other crime defined by law, or to enter into what is known as plural or celestial marriage, or who is a member of any order, organization or association which teaches, advises, counsels or encourages its members or devotees or any other persons to commit the crime of bigamy or polygamy, or any other crime defined by law, either as a rite or ceremony of such order, organization or association, or otherwise, is permitted to vote at any election, or to hold any position or office of honor, trust or profit within this Territory" is an exercise of the legislative power conferred upon Territories' by Rev. Stat. §§ 1851, 1859, and is not open to any constitutional or legal objection.

Bigamy and polygamy are crimes by the laws of the United States, by the laws of Idaho, and by the laws of all civilized and Christian countries; and to call their advocacy a tenet of religion is to offend the common sense of mankind.

A crime is none the less so, nor less odious, because sanctioned by what any particular sect may designate as religion.

It was never intended that the first Article of Amendment to the Constitution, that "Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof," should be a protection against legislation for the punishment of acts inimical to the peace, good order and morals of society.

The second subdivision of § 504 Rev. Stats. Idaho, requiring every person desiring to have his name registered as a voter to take an oath that he does not belong to an order that advises a disregard of the criminal law of the Territory, is not open to any valid legal objection.

The act of Congress of March 22, 1882, 22 Stat. 31, c. 47, " to amend section fifty-three hundred and fifty-two of the Revised Statutes of the United States, in reference to bigamy, and for other purposes," does not restrict the legislation of the Territories over kindred offences or over the means for their ascertainment and prevention.

The cases in which the legislation of Congress will supersede the legislation of a State or Territory, without specific provisions to that effect, are those in which the same matter is the subject of legislation by both.

In April, 1889, the appellant, Samuel D. Davis, was indicted in the District Court of the Third Judicial District of the Territory of Idaho, in the county of Oneida, in connection with divers persons named, and divers other persons whose names were unknown to the grand jury, for a conspiracy to unlawfully pervert and obstruct the due administration of the laws of the Territory, in this that they would unlawfully procure themselves to be admitted to registration as electors of said county of Oneida for the general election then next to occur in that county, when they were not entitled to be admitted to such registration, by appearing before the respective registrars of the election precincts in which they resided, and taking the oath prescribed by the statute of the State, in substance as follows: "I do swear (or affirm) that I am a male citizen of the United States of the age of twenty-one years (or will be on the 6th day of November, 1888); that I have (or will have) actually resided in this Territory four months and in this county for thirty days next preceding the day of the next ensuing election; that I have never been convicted of treason, felony or bribery; that I am not registered or entitled to vote at any other place in this Territory; and I do further swear that I am not a bigamist or polygamist; that I am not a member of any order, organization or association which teaches, advises, counsels or encourages its members, devotees or any other person to commit the crime of bigamy or polygamy, or any other crime defined by law, as a duty arising or resulting from membership in such order, organization or association, or which practises bigamy, polygamy or plural or celestial marriage as a doctrinal rite of such organization; that I do not and will not, publicly or privately, or in any manner whatever teach, advise, counsel or encourage any person to commit the crime of bigamy or polygamy, or any other crime defined by law, either as a religious duty or otherwise; that I do regard the Constitution of the United States and the laws thereof and the laws of this Territory, as interpreted by the courts, as the supreme laws of the land, the teachings of any order, organization or association to the contrary notwithstanding, so help me God," when, in truth, each of the defendants was

a member of an order, organization and association, namely, the Church of Jesus Christ of Latter-Day Saints, commonly known as the Mormon Church, which they knew taught, advised, counselled and encouraged its members and devotees to commit the crimes of bigamy and polygamy as duties arising and resulting from membership in said order, organization and association, and which order, organization and association, as they all knew, practised bigamy and polygamy, and plural and celestial marriage as doctrinal rites of said organization; and that in pursuance of said conspiracy the said defendants went before the registrars of different precincts of the county (which are designated) and took and had administered to them respectively the oath aforesaid.

The defendants demurred to the indictment, and the demurrer being overruled they pleaded separately not guilty. On the trial which followed on the 12th of September, 1889, the jury found the defendant, Samuel D. Davis, guilty as charged in the indictment. The defendant was thereupon sentenced to pay a fine of $500, and in default of its payment to be confined in the county jail of Oneida County for a term not exceeding 250 days, and was remanded to the custody of the sheriff until the judgment should be satisfied.

Soon afterwards, on the same day, the defendant applied to the court before which the trial was had, and obtained a writ of *habeas corpus*, alleging that he was imprisoned and restrained of his liberty by the sheriff of the county; that his imprisonment was by virtue of his conviction and the judgment mentioned and the warrant issued thereon; that such imprisonment was illegal; and that such illegality consisted in this: 1, that the facts in the indictment and record did not constitute a public offence, and the acts charged were not criminal or punishable under any statute or law of the territory; and, 2, that so much of the statute of the territory as [1]

---

[1] "No person under guardianship, *non compos mentis* or insane, nor any person convicted of treason, felony, or bribery in this Territory or in any other State or Territory in the Union, unless restored to civil rights; nor any person who is a bigamist or polygamist or who teaches, advises, counsels, or encourages any person or persons to become bigamists or polyga-

provides that no person is entitled to register or vote at any election who is "a member of any order, organization, or association which teaches, advises, counsels, or encourages its members, devotees, or any other person to commit the crime of bigamy or polygamy, or any other crime defined by law, as a duty arising or resulting from membership in such order, organization, or association, or which practises bigamy or polygamy or plural or celestial marriage as a doctrinal rite of such organization" is a "law respecting an establishment of re-

---

mists, or to commit any other crime defined by law, or to enter into what is known as plural or celestial marriage, or who is a member of any order, organization, or association which teaches, advises, counsels, or encourages its members or devotees or any other persons to commit the crime of bigamy or polygamy, or any other crime defined by law, either as a rite or ceremony of such order, organization, or association, or otherwise, is permitted to vote at any election, or to hold any position or office of honor, trust, or profit within this Territory. Rev. Stats. Idaho, § 501.

"The registrar must, before he registers any applicant, require him to take and subscribe the oath, to be known as the 'elector oath,' which is as follows:

"I do swear (or affirm) that I am a male citizen of the United States of the age of twenty-one (21) years (or will be on the          day of          , 18—, naming date of next succeeding election). That I have (or will have) actually resided in this Territory for four (4) months and in this county for thirty (30) days next preceding the day of the next ensuing election (in case of any election requiring different time of residence so make it). That I have never been convicted of treason, felony, or bribery; that I am not now registered or entitled to vote at any other place in this Territory; and I do further swear that I am not a bigamist or polygamist; that I am not a member of any order, organization, or association which teaches, advises, counsels, or encourages its members, devotees, or any other person to commit the crime of bigamy or polygamy, or any other crime defined by law, as a duty arising or resulting from membership in such order, organization, or association, or which practises bigamy or polygamy or plural or celestial marriage as a doctrinal rite of such organization; that I do not, and will not, publicly or privately, or in any manner whatever, teach, advise, counsel, or encourage any person to commit the crime of bigamy or polygamy, or any other crime defined by law, either as a religious duty or otherwise; that I do regard the Constitution of the United States and the laws thereof, and of this Territory, as interpreted by the courts, as the supreme law of the land, the teachings of any order, organization, or association to the contrary notwithstanding (when made before a judge of election add 'and I have not previously voted at this election'), so help me God." Id. § 504.

ligion," in violation of the first Amendment to the Constitution and void.

The court ordered the writ to issue, directed to the sheriff, returnable before it, at three o'clock in the afternoon of that day, commanding the sheriff to have the body of the defendant before the court at the hour designated, with the time and cause of his imprisonment, and to do and receive what should then be considered concerning him. On the return of the writ, the sheriff produced the body of the defendant and also the warrant of commitment under which he was held, and the record of the case showing his conviction for the conspiracy mentioned and the judgment thereon. To this return, the defendant, admitting the facts stated therein, excepted to their sufficiency to justify his detention. The court, holding that sufficient cause was not shown for the discharge of the defendant, ordered him to be remanded to the custody of the sheriff. From this judgment the defendant appealed to this court. Rev. Stat. § 1909.

*Mr. Jeremiah M. Wilson* and *Mr. Franklin S. Richards* (with whom was *Mr. Samuel Shellabarger* on the brief) for appellant.

The power of Congress (or the legislative assembly of a Territory) to pass a statute under which a prisoner is held in custody may be inquired into under a writ of *habeas corpus*, as affecting the jurisdiction of the court which ordered his imprisonment. And if the want of power appears, the court which has authority to issue the writ is bound to release him. *Hans Nielsen, Petitioner*, 131 U. S. 176, 183; *In re Coy*, 127 U. S. 731; *Ex parte Siebold*, 100 U. S. 371; *In re Snow*, 120 U. S. 274; *Ex parte Lange*, 18 Wall. 163.

The legislature of Idaho could not legally prescribe that a man who has never committed any crime should not have the right to register and vote, or hold office, because he belonged to a church organization that holds or teaches bigamy and polygamy as a doctrine of the church, membership in such organization not having been by law made a crime.

I. The statute disfranchising and disqualifying citizens from holding office for that reason is unconstitutional and void, because it prohibits "the free exercise of religion," and conflicts with the first amendment to the Constitution — that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." *Reynolds* v. *United States*, 98 U. S. 145, 162; *Dred Scott* v. *Sandford*, 19 How. 393, 450.

Religious liberty is a right embracing more than mere opinion, sentiment, faith, or belief. It includes all "*human conduct*" that gives expression to the relation between man and God; it includes "all frames of feeling, all forms of faith, and *acts* of worship" to which man is impelled by his hopes or fears; it includes the "*cultus*" or "outward expression of the religious sentiment;" it means "entire freedom of creed, thought and worship," with a restriction upon the government that it "cannot go behind the *overt act*;" in other words, it includes all acts of manifestation or exercise of religion which are not in violation of "peace and good order." *United States* v. *Reynolds*, 98 U. S. 163. That the term "free exercise of religion" was intended by the promoters of the first article of amendment to the Constitution to have this broad and comprehensive signification is apparent from an examination of the history of that period, to which this court said we should look for the meaning of the term, and in the *Reynolds case, supra*, pages 162, 163, 164, it gave an epitome thereof, in which it adopted the definition of religious freedom given in the preamble of the Virginia act, drafted by Mr. Jefferson, "for establishing religious freedom." 12 Henning's Statutes Virginia, 84, 85, 86. See also 1 Jefferson's Works, 45 (N. Y. 1853); 8 Sparks's Washington, 568; *Board of Education* v. *Minor*, 23 Ohio St. 211; *Attorney General* v. *Detroit*, 58 Michigan, 213; and state constitutions as follows: Georgia, 1777, Article 56; Maryland, Declaration of Rights, 1776, Article 33; Massachusetts, Declaration of Rights, 1780, Article 3; New Jersey, 1776, Article 18; North Carolina, 1776, Article 34; New York, 1777, Article 38; New Hampshire, Bill of Rights, 1784, Article 5; Pennsylvania, Declaration of Rights, 1776, Article 11; Virginia, Bill

of Rights, 1776 § 16; 3 Elliot's Debates, 659; 4 Elliot's Debates, 244; 2 Kent Com. 35; 2 Tucker's Blackstone, App. 4, 6, 10; 2 Story Const. § 1876, § 1879; Cooley's Const. Lim. 469, 470.

II. This Idaho statute violates the provision in the Fourteenth Article of Amendment to the Constitution of the United States that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

For the scope of this amendment see *Sinking Fund Cases*, 99 U. S. 700, 718; *Cummings* v. *Missouri*, 4 Wall. 277, 320; *Strauder* v. *West Virginia*, 100 U. S. 303, 307, 308; *Ex parte Virginia*, 100 U. S. 339, 347; *Yick Wo* v. *Hopkins*, 118 U. S. 356, 369; *United States* v. *Cruikshank*, 1 Woods, 308; *S. C.* 92 U. S. 542, 555; *Murphy* v. *Ramsey*, 114 U. S. 15, 44.

III. This Idaho statute violates the provision in article 6 of the Constitution of the United States, that "No religious test shall ever be required as a qualification to any office or public trust under the United States."

That this statute requires a religious test is apparent upon its face. The ground of disfranchisement is membership in an organization which encourages its members to commit bigamy or polygamy "*as a duty resulting from membership,*" or which *practices* bigamy or polygamy, or celestial marriage, "*as a doctrinal rite of such order.*" Simple encouragement to commit crime by an organization of which the citizen is a member does not disqualify him from voting, because, by the language of the act, the encouragement must be offered upon the ground of duty, or religious obligation arising from membership in the organization, or the latter must teach the commission of these acts from religious motives, otherwise the exclusion does not operate. And so also the practice must be "as a doctrinal rite," or the member is not excluded. In other words the practice must be as a tenet of faith, sanctified by a religious ceremony; and the language of the statute does not admit of such an interpretation as will disfranchise the

members of an organization existing solely for the promotion of crime, however heinous their acts may be, even though the primary and sole object of the organization be to commit murder, theft, arson, rape and other crimes which are *malum in se ;* unless their acts are the promptings of duty, or are performed " as doctrinal rites " or religious ceremonies, the members are not disqualified by this statute from voting or holding office.

Webster defines a "rite" as : "The act of performing divine or solemn service, as established by law, precept or custom; formal act of religion, or other solem.. duty ; a religious ceremony of usage."

The object of this legislation was not only to deprive citizens of the elective franchise because of their membership in a religious organization, the Mormon Church, but to confine the exclusion provided for to members of that religious organization.

IV. The Idaho statute is void because Congress has exercised its power on the same subject.

While denying the power of both Congress and the legislative assembly of Idaho to prescribe the test it has, as a qualification for voting and holding office, if in error as to the power of Congress in this regard, we still maintain that the territorial legislature could not prescribe it, for the reason that Congress had already legislated upon the subject, and its action is " the supreme law of the land."

Undoubtedly Congress had the right to legislate for the Territories, and the most that can be said for the territorial legislature is that it may legislate upon the same subjects if Congress has not already legislated thereon, and in that respect it stands in the same attitude towards Congress as a State, which may legislate if Congress does not; but if Congress does legislate a State cannot, or if the state has legislated and Congress afterwards does so, the state legislation is superseded.

The authorities on this subject are numerous and familiar.

It is now settled that when powers are exercised by Congress, the concurrent power in the inferior legislature ceases or is in abeyance; that the two legislative wills cannot be exercised

at the same time upon the same subject matter, and that of Congress, within its sphere, is "the supreme law of the land." *Ex parte McNiel,* 13 Wall. 236, 240 ; *Gilman* v. *Philadelphia,* 3 Wall. 713, 727 ; *Pennsylvania* v. *Wheeling Bridge,* 18 How. 421, 430 ; *Railroad Co.* v. *Fuller,* 17 Wall. 560, 568.

*Mr. H. W. Smith* for appellee.

MR. JUSTICE FIELD, after stating the case, delivered the opinion of the court.

On this appeal our only inquiry is whether the District Court of the Territory had jurisdiction of the offence charged in the indictment of which the defendant was found guilty. If it had jurisdiction, we can go no farther. We cannot look into any alleged errors in its rulings on the trial of the defendant. The writ of *habeas corpus* cannot be turned into a writ of error to review the action of that court. Nor can we inquire whether the evidence established the fact alleged, that the defendant was a member of an order or organization known as the Mormon Church, called the Church of Jesus Christ of Latter-Day Saints, or the fact that the order or organization taught and counselled its members and devotees to commit the crimes of bigamy and polygamy as duties arising from membership therein. On this hearing we can only consider whether, these allegations being taken as true, an offence was committed of which the territorial court had jurisdiction to try the defendant. And on this point there can be no serious discussion or difference of opinion. Bigamy and polygamy are crimes by the laws of all civilized and Christian countries. They are crimes by the laws of the United States, and they are crimes by the laws of Idaho. They tend to destroy the purity of the marriage relation, to disturb the peace of families, to degrade woman and to debase man. Few crimes are more pernicious to the best interests of society and receive more general or more deserved punishment. To extend exemption from punishment for such crimes would be to shock the moral judgment of the community. To call their

advocacy a tenet of religion is to offend the common sense of mankind. If they are crimes, then to teach, advise and counsel their practice is to aid in their commission, and such teaching and counselling are themselves criminal and proper subjects of punishment, as aiding and abetting crime are in all other cases. .

The term "religion" has reference to one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will. It is often confounded with the *cultus* or form of worship of a particular sect, but is distinguishable from the latter. The first amendment to the Constitution, in declaring that Congress shall make no law respecting the establishment of religion, or forbidding the free exercise thereof, was intended to allow every one under the jurisdiction of the United States to entertain such notions respecting his relations to his Maker and the duties they impose as may be approved by his judgment and conscience, and to exhibit his sentiments in such form of worship as he may think proper, not injurious to the equal rights of others, and to prohibit legislation for the support of any religious tenets, or the modes of worship of any sect. The oppressive measures adopted, and the cruelties and punishments inflicted by the governments of Europe for many ages, to compel parties to conform, in their religious beliefs and modes of worship, to the views of the most numerous sect, and the folly of attempting in that way to control the mental operations of persons, and enforce an outward conformity to a prescribed standard, led to the adoption of the amendment in question. It was never intended or supposed that the amendment could be invoked as a protection against legislation for the punishment of acts inimical to the peace, good order and morals of society. With man's relations to his Maker and the obligations he may think they impose, and the manner in which an expression shall be made by him of his belief on those subjects, no interference can be permitted, provided always the laws of society, designed to secure its peace and prosperity, and the morals of its people, are not interfered with. However free the exercise of religion may

be, it must be subordinate to the criminal laws of the country, passed with reference to actions regarded by general consent as properly the subjects of punitive legislation. There have been sects which denied as a part of their religious tenets that there should be any marriage tie, and advocated promiscuous intercourse of the sexes as prompted by the passions of its members. And history discloses the fact that the necessity of human sacrifices, on special occasions, has been a tenet of many sects. Should a sect of either of these kinds ever find its way into this country, swift punishment would follow the carrying into effect of its doctrines, and no heed would be given to the pretence that, as religious beliefs, their supporters could be protected in their exercise by the Constitution of the United States. Probably never before in the history of this country has it been seriously contended that the whole punitive power of the government for acts, recognized by the general consent of the Christian world in modern times as proper matters for prohibitory legislation, must be suspended in order that the tenets of a religious sect encouraging crime may be carried out without hindrance.

On this subject the observations of this court through the late Chief Justice Waite, in *Reynolds* v. *United States,* are pertinent. 98 U. S. 145, 165, 166. In that case the defendant was indicted and convicted under section 5352 of the Revised Statutes, which declared that "every person having a husband or wife living, who marries another, whether married or single, in a Territory, or other place over which the United States have exclusive jurisdiction, is guilty of bigamy, and shall be punished by a fine of not more than five hundred dollars, and by imprisonment for a term not more than five years." The case being brought here, the court, after referring to a law passed in December, 1788, by the State of Virginia, punishing bigamy and polygamy with death, said that from that day there never had been a time in any State of the Union when polygamy had not been an offence against society cognizable by the civil courts and punished with more or less severity; and added: "Marriage, while from its very nature a sacred obligation, is, nevertheless, in most civilized nations a

civil contract, and usually regulated by law.   Upon it society
may be said to be built, and out of its fruits spring social rela-
tions and social obligations and duties, with which government
is necessarily required to deal.   In fact, according as monoga-
mous or polygamous marriages are allowed, do we find the
principles on which the government of the people, to a greater
or less extent, rests."   And, referring to the statute cited, he
said : "It is constitutional and valid as prescribing a rule of
action for all those residing in the Territories, and in places
over which the United States have exclusive control.   This
being so, the only question that remains is, whether those who
make polygamy a part of their religion are excepted from the
operation of the statute.   If they are, then those who do not
make polygamy a part of their religious belief may be found
guilty and punished, while those who do must be acquitted
and go free.   This would be introducing a new element into
criminal law.   Laws are made for the government of actions,
and while they cannot interfere with mere religious belief and
opinions, they may with practices.   Suppose one believed that
human sacrifices were a necessary part of religious worship,
would it be seriously contended that the civil government
under which he lived could not interfere to prevent a sacrifice?
Or, if a wife religiously believed it was her duty to burn
herself upon the funeral pile of her dead husband, would it be
beyond the power of the civil government to prevent her carry-
ing her belief into practice?   So here, as a law of the organi-
zation of society under the exclusive dominion of the United
States, it is provided that plural marriages shall not be allowed.
Can a man excuse his practices to the contrary because of his
religious belief?   To permit this would be to make the pro-
fessed doctrines of religious belief superior to the law of the
land, and in effect to permit every citizen to become a law unto
himself.   Government could exist only in name under such
circumstances."   And in *Murphy* v. *Ramsey*, 114 U. S. 15, 45,
referring to the act of Congress excluding polygamists and
bigamists from voting or holding office, the court; speaking by
Mr. Justice Matthews, said : "Certainly no legislation can be
supposed more wholesome and necessary in the founding of a

free, self-governing commonwealth, fit to take rank as one of the coördinate States of the Union, than that which seeks to establish it on the basis of the idea of the family, as consisting in and springing from the union for life of one man and one woman in the holy estate of matrimony; the sure foundation of all that is stable and noble in our civilization; the best guaranty of that reverent morality which is the source of all beneficent progress in social and political improvement. And to this end no means are more directly and immediately suitable than those provided by this act, which endeavors to withdraw all political influence from those who are practically hostile to its attainment."

It is assumed by counsel of the petitioner, that because no mode of worship can be established or religious tenets enforced in this country, therefore any form of worship may be followed and any tenets, however destructive of society, may be held and advocated, if asserted to be a part of the religious doctrines of those advocating and practising them. But nothing is further from the truth. Whilst legislation for the establishment of a religion is forbidden, and its free exercise permitted, it does not follow that everything which may be so called can be tolerated. Crime is not the less odious because sanctioned by what any particular sect may designate as religion.

It only remains to refer to the laws which authorized the legislature of the Territory of Idaho to prescribe the qualifications of voters and the oath they were required to take. The Revised Statutes provide that "the legislative power of every Territory shall extend to all rightful subjects of legislation not inconsistent with the Constitution and laws of the United States. But no law shall be passed interfering with the primary disposal of the soil; no tax shall be imposed upon the property of the United States; nor shall the lands or other property of non-residents be taxed higher than the lands or other property of residents." Rev. Stat. § 1851.

Under this general authority it would seem that the territorial legislature was authorized to prescribe any qualifications for voters calculated to secure obedience to its laws. But, in addition to the above laws, § 1859 of the Revised Statutes

provides that "every male citizen above the age of twenty-one, including persons who have legally declared their intention to become citizens in any Territory hereafter organized, and who are actual residents of such Territory at the time of the organization thereof, shall be entitled to vote at the first election in such Territory, and to hold any office therein; subject, nevertheless, to the limitations specified in the next section," namely, that at all elections in any Territory subsequently organized by Congress, as well as at all elections in Territories already organized, the qualifications of voters and for holding office shall be such as may be prescribed by the legislative assembly of each Territory, subject, nevertheless, to the following restrictions:

First. That the right of suffrage and of holding office shall be exercised only by citizens of the United States above the age of twenty-one or persons above that age who have declared their intention to become such citizens;

Second. That the elective franchise or the right of holding office shall not be denied to any citizen on account of race, color, or previous condition of servitude;

Third. That no soldier or sailor or other person in the army or navy, or attached to troops in the service of the United States, shall be allowed to vote unless he has made his permanent domicil in the Territory for six months; and,

Fourth. That no person belonging to the army or navy shall be elected to or hold a civil office or appointment in the Territory.

These limitations are the only ones placed upon the authority of territorial legislatures against granting the right of suffrage or of holding office. They have the power, therefore, to prescribe any reasonable qualifications of voters and for holding office not inconsistent with the above limitations. In our judgment, § 501 of the Revised Statutes of Idaho Territory, which provides that "no person under guardianship, *non compos mentis* or insane, nor any person convicted of treason, felony, or bribery in this Territory, or in any other State or Territory in the Union, unless restored to civil rights; nor any person who is a bigamist or polygamist or who teaches, advises,

counsels, or encourages any person or persons to become big? mists or polygamists, or to commit any other crime defined by law, or to enter into what is known as plural or celestial marriage, or who is a member of any order, organization or association which teaches, advises, counsels, or encourages its members or devotees or any other persons to commit the crime of bigamy or polygamy, or any other crime defined by law, either as a rite or ceremony of such order, organization, or association or otherwise, is permitted to vote at any election, or to hold any position or office of honor, trust, or profit within this Territory," is not open to any constitutional or legal objection. With the exception of persons under guardianship or of unsound mind, it simply excludes from the privilege of voting, or of holding any office of honor, trust or profit, those who have been convicted of certain offences, and those who advocate a practical resistance to the laws of the Territory and justify and approve the commission of crimes forbidden by it. The second sub-division of § 504 of the Revised Statutes of Idaho, requiring every person desiring to have his name registered as a voter to take an oath that he does not belong to an order that advises a disregard of the criminal law of the Territory, is not open to any valid legal objection to which our attention has been called.

The position that Congress has, by its statute, covered the whole subject of punitive legislation against bigamy and polygamy, leaving nothing for territorial action on the subject, does not impress us as entitled to much weight. The statute of Congress of March 22, 1882, amending a previous section of the Revised Statutes in reference to bigamy, declares "that no polygamist, bigamist, or any person cohabiting with more than one woman, and no woman cohabiting with any of the persons described as aforesaid in this section, in any Territory or other place over which the United States have exclusive jurisdiction, shall be entitled to vote at any election held in any such Territory or other place, or be eligible for election or appointment to or be entitled to hold any office or place of public trust, honor or emolument in, under, or for any such Territory or place, or under the United States." 22 Stat. 31, c. 47, § 8.

This is a general law applicable to all Territories and other places under the exclusive jurisdiction of the United States. It does not purport to restrict the legislation of the Territories over kindred offences or over the means for their ascertainment, and prevention. The cases in which the legislation of Congress will supersede the legislation of a State or Territory, without specific provisions to that effect, are those in which the same matter is the subject of legislation by both. There the action of Congress may well be considered as covering the entire ground. But here there is nothing of this kind. The act of Congress does not touch upon teaching, advising and counselling the practice of bigamy and polygamy, that is, upon aiding and abetting in the commission of those crimes, nor upon the mode adopted, by means of the oath required for registration, to prevent persons from being enabled by their votes to defeat the criminal laws of the country.

The judgment of the court below is therefore

*Affirmed.*

NOTE.—The constitutions of several States, in providing for religious freedom, have declared expressly that such freedom shall not be construed to excuse acts of licentiousness, or to justify practices inconsistent with the peace and safety of the State. Thus, the constitution of New York of 1777 provided as follows: "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever hereafter be allowed, within this State, to all mankind: *Provided,* That the liberty of conscience, hereby granted, shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this State." Article xxxviii, 2 Charters and Constitutions, 1338. The same declaration is repeated in the constitution of 1821 (Article vii, Section 3, Id. 1347) and in that of 1846, (Article I, Section 3, Id. 1351,) except that for the words "hereby granted," the words "hereby secured" are substituted. The constitutions of California, Colorado, Connecticut, Florida, Georgia, Illinois, Maryland, Minnesota, Mississippi, Missouri, Nevada and South Carolina contain a similar declaration.