THE PEOPLE OF THE STATE OF NEW YORK ex rel. OUTER COURT, INCORPORATED, OF THE ORDER OF THE LIVING CHRIST, Relator, *v.* WILLIAM STANLEY MILLER and Others, as Commissioners of Taxes and Assessments of the City of New York, Respondents.

Supreme Court, Special Term, New York County, December 21, 1936.

*Richard Weed* [*William J. Bradshaw* of counsel], for the relator.

*Paul Windels, Corporation Counsel* [*Oscar S. Cox* and *Hyman W. Kahl* of counsel], for the respondents.

COTILLO, J. Relator, a membership corporation, brings this proceeding to establish its right to tax exemption upon about twelve acres of land situate in the borough of the Bronx, on the ground that it was organized for " religious, charitable, benevolent, missionary and educational purposes," and that the real estate in question is occupied and used by relator exclusively for carrying out such corporate purposes. The total assessment involved is $245,000, of which $5,200 represents improvements, consisting of about twenty-four small buildings of the portable bungalow type. The greater portion of the tract is woodland undeveloped save for paths and lanes. The premises are described by relator as a retreat used in connection with other activities of a religious nature, for the benefit of its members and its invitees, including non-members employed by relator as well as total outsiders. Some of these pay small fees as voluntary contributions for the use of the property.

Prior to 1916 there existed in New York an unincorporated religious order known as the Order of the Living Christ. In order to provide a legal instrumentality for the conduct of the outside affairs of this order there was incorporated in 1916 under the laws of this State " The Outer Court, Incorporated, of the Order of the Living Christ " as a membership corporation. The directors of the order became the directors of the corporation. Prior to the incorporation the order was run under what was termed the " Statutes for the Right Governance of the Order." These statutes formed the basis of the by-laws of the corporation. In the certificate of incorporation the corporate purposes are set forth as follows: " To spread an understanding of the life and doctrine of Jesus Christ; to turn men's wills to conform to such understanding, and to do all things which will further those ends, particularly to proclaim and to demonstrate that discipleship is in all times an immediate possibility, and that Christ, our divine King, is a living Christ."

The order consists of thirty-seven men and women, divided into members and novices of various degrees. The corporation consists of men and women who individually are members of different Christian denominations, and who have associated themselves together for mutual assistance in furthering those central religious aims to which they have particularly consecrated themselves.

The purposes of the order are as follows:

" 1. To train its Members, and Postulants for Membership, in the path of discipleship and the way of the Cross.

" 2. To proclaim and to demonstrate that discipleship is in all times an immediate possibility, and that Christ, our divine King, is a living Christ.

" 3. To strive in all ways to draw souls to the love and knowledge of Christ, and to the privilege of His service.

" 4. To educate children, so that, as Christ's faithful soldiers and servants, they may become noble and efficient men and women."

The financial support of the order and its work comes from voluntary gifts from its members. There are three sources from which payment of expenses is made. The largest amount is contributed by direct gifts from members to specific activities carried on by the order. The expense of chapel farm in particular is shared by persons coming there who wish to contribute, but the major amount of that expense is paid by the three members of the first degree who are regularly at chapel farm. These payments are made monthly through a special account of the director general and are recorded by his secretary. They include maintenance of the property and the living expenses of persons in retreat there. The third source is a bank account kept in the name of the corporation to which gifts made direct to the corporation are credited, and from which payments are made by the corporation for the support of its activities generally. The total expenditures by all three methods is in the neighborhood of $50,000 per annum. The separate handling of the expenses of chapel farm is to insure that the three directors in permanent retreat there should themselves discharge all expenses connected with their maintenance, and thereby exclude the possibility that any part of their living expense might be a burden on the resources of the order.

This is a tract which has been estimated as ten to twelve acres on the top of a hill at Riverdale, a residential section of the Bronx. It is mainly woodland. In various parts of the property twenty-four small buildings have been erected for various uses. Paths have been cut and maintained through the woods, here and there a table and chair for solitary meditation and study, and somewhat larger roughly flagged places for outdoor meetings. In other respects the natural woodland conditions have been preserved.

Chapel farm was first rented in 1917 for purposes of the order. In 1923, after six years of use, the first purchase was made, consisting of by far the greater part of the relator's present property. During all this period it was used for religious retreat, training, study and literary work, much as it is used at present, except that the general direction of the order was not located there. At that time the headquarters of the order were at 10 Horatio street, New York city. Buildings were erected, some of them by the members' own hands. It was found that the property purchased was inadequate to secure the quiet and freedom from contact with the outside world that is essential to the earnest concentration from

which a retreat derives its effectiveness. More land was bought in 1925 and 1927. (Additional land acquired in 1931 was the result of straightening a boundary.)

The opening of West Two Hundred and Fiftieth street and Iselin avenue on the southwest side brought the outside world nearer. The intervening property was purchased by Mrs. Griscom, a member of the order, protecting the tract on the southwest. A real estate development took place on the north side between the property and West Two Hundred and Fifty-third street, and houses were erected. This property was also bought by members of the order in 1929 to 1931, again to secure the quiet necessary for a place of religious retreat. In 1929 the headquarters and direction of all the order's work was moved to chapel farm.

At the present time the property is still maintained and constantly used for a place of monastic retreat for the thirty-seven members of the order. Five of them are there winter and summer, occupying the small, bare buildings which were reported to the tax commissioners as unfit for year-round occupation. Among them are the members of the first degree, whose self-dedication to the religious life includes the three monastic vows. For the past eight years, without intermission, they have lived a monastic life of work and prayer in these little frame structures, almost within sight of substantial residences owned by them on the adjacent land — the testimony being that two have never spent a night in their own houses, and the third only when taken there for care in a serious illness.

The other buildings, other than the service buildings, are used for retreats, divided between men and women in different parts of the ground. Many of them are for a single occupant, but there are also a guest house for women and a house for men postulants. There is also a summer assembly room. All the living quarters are furnished with a minimum equipment. The whole, including the members' adjacent lands, is inclosed by a fence. There is no physical division on the land indicating the separate tax lots or plotted streets, the whole being used as a unit.

In each of the buildings there is a card on which, under a representation of the crucifix, is printed a statement of what is to be sought in the use of chapel farm. The following are excerpts:

" This is a place for prayer and spiritual refreshment, where the natural man may be held in subjection, and the spiritual man find strength and encouragement."

" Worldliness and sloth have no place here, nor self-indulgence of any kind whatsoever."

" We beg you therefore to leave these behind you when you come, and to enter into the spirit of our life as far as you are able — incessant work and incessant prayer, in the presence of the Master."

" There is opportunity for study; above all for self-examination and for prayer — intercessory prayer also; and be it remembered that this last is of no effect unless accompanied by self-discipline and sacrifice."

" We would ask you to remember quietude and silence. This is a place ' set apart.' Thin partitions might be regarded as drawbacks; but at the Farm all things are opportunities for training."

" When the bell rings on the Hours, we ask you to pray with us, Thy Kingdom Come, with a special remembrance of our Lord's cry on the Cross, I Thirst, beseeching Him for what we are striving to establish here."

" And may the Peace of God which passeth understanding, keep your hearts and minds in the knowledge and love of our Lord Jesus Christ. Amen."

Chapel farm is the headquarters of the relator corporation. It is there that its work is organized, controlled and directed, and its records kept. The workers in the activities of the order, postulants and aspirants, make their reports to chapel farm and receive instructions and direction from the superiors of the order.

Weekly meetings of the postulants are held at chapel farm under an order of business, which embraces both their individual response to the call for discipleship, and the conduct of the order's work on which they are engaged, explicitly including the work of the Chapel of the Comforter for which this group has been made primarily responsible.

The training of the novices of the order is carried on through such meetings and by personal contact and direction of studies during the periods of retreat.

At chapel farm, also, is produced the literary work, books, pamphlets and articles, both directly religious and of indirect religious implication, some of which are published by the order and distributed through various channels, others through publication in established periodicals and other religious and secular media. Correspondence is carried on with persons whose interest has been aroused through reading these literary products. In this manner, among others, the search for new men and women fitted for work in the order is carried on. Through the day, when the bell rings on the canonical house, all work ceases for prayer. The farm has also been used to receive visiting members of the order from foreign lands.

A membership of thirty-seven is claimed for this corporation. Three of these members constitute the officers and the board of directors and appear to be in sole and exclusive control of all its matters. It was shown that these three individually privately own eight parcels of real estate surrounding the corporation's property, which is used by them for private purposes. It appears, however, that these adjoining properties were purchased by such members long after the corporation acquired its real estate, in order to preserve seclusion and prevent encroachments resulting from the opening of new streets in the vicinity. The remaining persons included in the corporate membership are designated as novices, and are apparently applicants for membership in the order. Their status has remained for some time as mere novices or applicants, leaving the three persons above described as the only members having a voice in the management of the membership corporation.

Aside from the " retreat " for which exemption is sought, the order is interested in two other activities which are centered in the borough of Manhattan, namely, the Chapel of the Comforter at 10 Horatio street, in connection with which is maintained a free school for children, and the Women's Community House, at 157 West Thirteenth street, where reside women in the service of the order, chiefly teachers in the chapel school. The chapel itself was formerly a mission of the Episcopal church. In 1908 the order took it over and in 1914 incorporated it as a parish of the Episcopal church under the Religious Corporations Law. The property itself was purchased in 1923 by the order, title being taken in the name of the Chapel of the Comforter. Operation and control of this activity is exercised by its rector, wardens, treasurers and vestrymen. Two of these — the wardens — are two of the three active members of the order. All the rest are postulants, *i. e.*, applicants for membership in the order.

There can be little doubt but that these two activities of the order are of a religious and educational nature. Its financial support is derived from voluntary gifts of its members, the major portion of which comes from the three directors of " members of the first degree."

The tract of land for which tax exemption is here sought, known as the chapel farm, appears to be devoted exclusively to purposes allied to those for which the order was incorporated. Aside from headquarters for the general direction of the order, its chief use is that of a retreat for the religious training of its members, postulants and its employees who are being trained either for membership or for teaching in the chapel school. No other use of the premises appears from the record, which shows the premises to be solely

designed and exclusively used as a retreat in connection with the order's religious activities, which in turn are confined to the searching out of persons responsive to Christian discipleship, the training of such persons for that work, and the conduct and support of religious, educational and charitable activities. Criticism is made of the fact that active membership is at present and has been for some time past comprised of three persons in absolute control, and that applicants for membership have kept that status for years. The number of members constitutes no criterion here, and I discern no bad faith in the make-up of the order. On the contrary, it appears to be conducted on a high religious plane, wholly devoid of commercialism. The inference that the land in question is used as a vacation spot for members and postulants finds no support in the proof. On the contrary, the only proof adduced indicates it is adapted for and devoted to use solely as a religious retreat and has been so used exclusively for many years. The ownership of adjacent lands by the three members is shown to have originated solely in the desire to preserve the quiet and seclusion necessary to the purposes for which it is used.

The fact that the order is incorporated under the Membership Corporations Law instead of the Religious Corporations Law, and is not a recognized sect or denominational church, is not decisive. (*Matter of Watson*, 36 Misc. 504; revd. on other grounds, 171 N. Y. 256; *Davis* v. *Beason*, 133 U. S. 333.) Nor is it necessary to gain exemption by a showing that the religious purposes are open to the public. (*St. Barbara's R. C. Church* v. *City of N. Y.*, 243 App. Div. 804.) The public benefit received in return for tax exemption is found in the religious nature of the work carried on by relator. The propagation of the Christian religion, the training of teachers and the preparing of others to carry on the work of the order is an asset to the community and to the State.

The standing and character of the members of the order as shown by their appearance and standing in the community is above reproach and their good faith in this application cannot be questioned. It is devoted exclusively to religious and educational purposes, and the property in question is put to direct use in connection therewith. There is no basis for any claim of profit from operations or failure of fulfillment of the high corporate aims.

The court is fully aware that the granting of exemption from taxes to corporations, whether religious, benevolent or charitable, which either by their charter provisions or by the service that they render to their community, creates an inequality and means that the rest of the taxpayers must pay higher taxes than ordinarily would be

levied. However, exemption from taxes originated in an effort on the part of governmental authorities to compensate landowners for services supposedly rendered to the government; in other words, it is intended as a reward or compensation for services rendered in the performance of some function deemed socially desirable.

Tax exemption or such method of compensation for services rendered has, however, tended to become a free-for-all contest on the part of State legislators, with the result that municipalities are now forced to forego taxes on lands and buildings to the extent of millions of dollars, without an adequate corresponding return to the community in a great many instances. Today section 4 of the Tax Law (especially subdivision 6) in many respects imposes a hardship not only on the State but also on the average taxpayer. The fault, if any, lies with the Legislature, and not with the courts, which are compelled to follow the verbiage of subdivision 6. Relief from this situation can only be obtained from the Legislature.

What I have just said is not to be deemed a stricture upon the worthy work of the relator.

Much as I dislike to add to the burdens of other realty, I am of the opinion that the premises in question are entitled to exemption under the statute.

Submit findings of fact and conclusions of law together with the proposed judgment.