**UNITED STATES of America,**
**Plaintiff,**

v.

**Samuel MULLET, Sr.,**
**et al., Defendants.**

**Case No. 5:11 CR 594.**

United States District Court,
N.D. Ohio,
Eastern Division.

May 31, 2012.

Edward G. Bryan, Timothy C. Ivey, Office of the Federal Public Defender, Cleveland, OH, Robert E. Duffrin, Boardman, OH, Samuel G. Amendolara, Damian A. Billak, Neal G. Atway, James S. Gentile, Youngstown, OH, Nathan A. Ray, Burdon

& Merlitti, J. Dean Carro, University of Akron, Akron, OH, for Defendants.

### *OPINION AND ORDER*

DAN A. POLSTER, District Judge.

On March 28, 2012, a federal grand jury issued a 10–count superseding indictment (Doc. # 87) charging the Defendants [1] with, among other things, committing hate crimes in violation of the Matthew Shepard and James Byrd, Jr., Hate Crimes Prevention Act of 2009, 18 U.S.C. § 249(a)(2).[2] The superseding indictment alleges that the Defendants, members of the Amish faith, committed acts of violence against other Amish as punishment for their beliefs and practices. The Defendants challenge the hate-crime charges and have filed motions to dismiss (Docs. ## 73, 79).[3] For the reasons explained below, the Court denies the motions.

## I. Background

■ The Court will begin by applying the familiar and well-established rule that, in reviewing a motion to dismiss an indictment, the factual allegations in the indictment are taken as true. *Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 96 L.Ed. 367 (1952).

The nine alleged victims, whose identities the Government has not revealed, are members of the Old Order Amish faith living in northeast Ohio. For them, beard and head hair are sacred symbols.

The sixteen Defendants, all of whom live in Bergholz, Ohio, also purport to be Amish, and their spiritual leader is Samuel

---

1. There are 16 of them: Lester M. Miller, Samuel Mullet, Sr., Raymond Miller, Levi F. Miller, Daniel S. Mullet, Emanuel Schrock, Freeman Burkholder, Lester S. Mullet, Linda Schrock, Eli M. Miller, Kathryn Miller, Elizabeth Miller, Anna Miller, Lovina Miller, and Emma Miller.

2. The other charges include conspiracy, obstruction of justice, and making false statements to the Government.

3. An amicus brief was also filed by the Center for Individual Rights in behalf of the Defendants. (Doc. # 95). The Court has reviewed and considered that brief.

Mullet, Sr. They call him Bishop, and he ensures his fellow Amish live their lives in a manner consistent with scriptural teachings—as interpreted by him. Mullet demands obedience, not only to the Amish faith as he sees it, but also to his authority.

Mullet expects the men to demonstrate their devotion to him by giving up their wives. He expects the women to leave their families—husbands, children, and all—to live with him, to have sex with him, and to learn from him how to satisfy their husbands. But not all are willing to submit.

In the fall of last year, the Defendants decided to shame and humiliate the Amish men and women who refused to comply with Mullet's directives. On September 6, 2011, Defendant Lester Miller went to Mullet's house to pick up battery-operated hair clippers, which had been purchased at a Walmart and manufactured in the state of Delaware. Then, with the help of a hired chauffeur, several of the Defendants went to Trumbull County, Ohio, where two of the victims were living. The Defendants went to the victims' home, entered, held them down, and, using scissors and the electric hair clippers, cut off the husband's beard, cut the wife's head hair, and took her bonnet. The Defendants assaulted the remaining victims in similar fashion over the next few weeks.

Their violent conduct spanned four counties and two judicial districts and were carried out with the use of hired drivers, motor vehicles, horse trailers, the U.S. mail system (which was used to lure a victim to the area where he was attacked), electric hair clippers, and a pair of 8″ horse mane shears—thick enough to cut through leather—which were manufactured in the state of New York and sent via private, interstate postal carrier to Ohio. The Defendants memorialized their acts with a disposable camera.

Mullet announced the purpose of the attacks during a series of media interviews shortly before his arrest. He said the hair cuttings were all about religion. They were intended as punishment for those who refused to listen to him or to obey his edicts. They were meant to send a message to the Amish community that the victims should be ashamed for the way they treated him and the community.

The grand jury charged the Defendants with violating section 249(a)(2) of the Hate Crimes Prevention Act. The Defendants have filed motions to dismiss pursuant to Rule 12 of the Federal Rules of Criminal Procedure, which permits a defendant to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." FED. R.CRIM. P. 12(b)(2).

The Defendants' motions can be boiled down to the following three arguments: (1) The portion of the Hate Crimes Prevention Act with which the Defendants are charged, 18 U.S.C. § 249(a)(2), is unconstitutional, both facially and as applied to the Defendants, because it exceeds Congress's authority under the Commerce Clause; (2) The Hate Crimes Prevention Act unconstitutionally infringes the Defendants' First Amendment freedom of religion and freedom of expression; and (3) Even if the statute is constitutional, Congress did not intend for it to apply to intrareligious conduct (*e.g.*, Amish on Amish violence).

## II. Analysis

### A. Interstate Commerce Clause Power

Section 249(a)(2) of the Hate Crimes Prevention Act makes it a crime for someone "in any circumstance described in subparagraph (B)" to willfully cause "bodily injury to any person ... because of the actual or perceived religion" of that person. 18 U.S.C. § 249(a)(2)(A). The cir-

cumstances described in subparagraph (B) include conduct in which "the defendant uses a channel, facility, or instrumentality of interstate or foreign commerce," conduct in which "the defendant employs a . . . weapon that has traveled in interstate or foreign commerce," and conduct that "otherwise affects interstate or foreign commerce." *Id.* at § 249(a)(2)(B). Section 249(a)(2) was enacted by Congress pursuant to its interstate commerce clause power. *See* "Congressional Findings", Matthew Shepard and James Byrd, Jr., Hate Crimes Prevention Act, Pub.L. No. 111–84, 123 Stat. 2835 (finding that federal involvement in crimes motivated by bias is warranted because the crimes are sufficiently serious, widespread, and interstate and listing the numerous ways such violence "substantially affects interstate commerce"); U.S. CONST. Art. I, § 8, cl. 3.

Defendants cite *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), and *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), to support their argument that the statute exceeds Congress's power under the Commerce Clause. These cases, however, cut the other way. In *Lopez* the Supreme Court struck down a federal statute that criminalized the possession of a gun near a school. In *Morrison,* the Supreme Court struck down a statute—the Violence Against Women Act—that provided a federal civil remedy for victims of gender-motivated violence. Although Congress made findings that the conduct regulated by those statutes affected interstate commerce, neither of the statutes required the Government to prove as an element of the crime or cause of action a specific interstate "hook," such as the interstate travel of the defendant or victim or the use of a weapon that traveled in interstate commerce. This was critical because a jurisdictional element would ensure, through case-by-case inquiry, that the proscribed conduct affects interstate com-

merce. *See Lopez,* 514 U.S. at 561, 115 S.Ct. 1624.

Following the Supreme Court decision in *Lopez,* Congress promulgated a new statute to address the Supreme Court's objections. The current statute, 18 U.S.C. § 922(q), requires the Government to prove beyond a reasonable doubt that the firearm in question traveled in interstate or foreign commerce. This statute, along with the remainder of 18 U.S.C. § 922, the major federal firearms statute, has been consistently upheld against constitutional challenge. *See United States v. Dorsey,* 418 F.3d 1038, 1045 (9th Cir.2005) (upholding 18 U.S.C. § 922(q) and noting that the jurisdictional element saves the law from the infirmity that defeated it in *Lopez* ); *United States v. Danks,* 221 F.3d 1037, 1039 (8th Cir.1999) (same); *see also United States v. Turner,* 77 F.3d 887 (6th Cir. 1996) (upholding 18 U.S.C. § 922(g)(1) and noting that "Every court of appeals that has been faced with this question since *Lopez* has held that the jurisdictional element of § 922(g) provides the requisite nexus with interstate commerce that [the former] § 922(q) lacked."); *United States v. Abernathy,* 83 F.3d 17 (1st Cir.1996) (upholding 18 U.S.C. § 922(k)); *Frank v. United States,* 78 F.3d 815 (2d Cir.1996) (upholding 18 U.S.C. § 922(s)(2)); *United States v. Monteleone,* 77 F.3d 1086 (8th Cir.1996) (upholding 18 U.S.C. § 922(d)); *United States v. Miller,* 74 F.3d 159 (8th Cir.1996) (per curiam) (upholding 18 U.S.C. § 922(u)); *United States v. Brown,* 72 F.3d 96 (8th Cir.1995) (per curiam); *United States v. Rambo,* 74 F.3d 948 (9th Cir.1996) (upholding 18 U.S.C. § 922(*o* )); *United States v. Snow,* 82 F.3d 935 (10th Cir.1996) (upholding 18 U.S.C. § 922(u)).

▮ Indeed, "[i]ncorporating a jurisdictional element into the offense has traditionally saved statutes from Commerce Clause challenges." *United States v. Dorsey,* 418 F.3d 1038, 1045 (9th Cir.

2005). And so it is with the Hate Crimes Prevention Act. The statute requires the Government to allege and prove beyond a reasonable doubt a jurisdictional nexus, establishing an explicit connection between the prohibited conduct and interstate commerce. The statute expressly criminalizes conduct in which the defendant used a weapon that traveled in interstate commerce or an instrumentality of interstate commerce. Here, the superseding indictment alleges that the Defendants used scissors and hair clippers, which had traveled from out of state into Ohio, to carry out the assault, in compliance with the jurisdictional element spelled out in section 249(a)(2)(B)(iii) of the statute. The superseding indictment also alleges that the defendants lured a victim by using the mail system and used motor vehicles to facilitate each assault, establishing the jurisdictional element at section 249(a)(2)(B)(ii). Accordingly, under well-established case law, the Hate Crimes Prevention Act is constitutional on its face and as applied here.[4]

### B. First Amendment

■ Defendants argue that the Hate Crimes Prevention Act violates the First Amendment because it infringes their freedom of religion and expression. This argument is misplaced. The religious belief and expression of the Defendants are immaterial; it is the religious belief or expression of the victim that matters. Indeed, the statute says nothing about the religion and beliefs of the defendant.

■ The First Amendment protects belief, expression, and speech. *Reynolds v.*

*United States,* 98 U.S. 145, 166, 25 L.Ed. 244 (1878). The Hate Crimes Prevention Act preserves this principle, prohibiting prosecution based solely on a defendant's beliefs and opinions. "Rules of Construction", Pub.L. No. 111–84, 123 Stat. 2841 (providing that the statute shall not be "construed to allow prosecution based solely upon an individual's expression of racial, religious, political, or other beliefs or solely upon an individual's membership in a group advocating or espousing such beliefs" and shall not be construed to diminish any First Amendment rights).

■ The First Amendment has never been construed to protect acts of violence against another individual, regardless of the motivation or belief of the perpetrator. *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 916, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) ("The First Amendment does not protect violence."); *see also Davis v. Beason,* 133 U.S. 333, 345, 10 S.Ct. 299, 33 L.Ed. 637 (1890) ("Crime is not the less odious because sanctioned by what any particular sect may designate as religion."). In fact, violent acts of the kind charged in the superseding indictment are designed to punish individuals who exercise their religious beliefs, or to chill others from doing so.

It is particularly offensive for these Defendants to claim that the First Amendment provides a shield for their violent conduct, for it is the First Amendment that allows Defendants to maintain their religious beliefs and practices, which are so different from the beliefs and practices of most Americans.[5]

---

4. Since there is a fundamental principle that courts are not to render advisory opinions, nor decide issues not before it, the Court expresses no opinion about the constitutionality of a prosecution based solely on the "otherwise affects interstate or foreign commerce" portion of the statute, 18 U.S.C. § 249(a)(2)(B)(iv)(II).

5. In recognition of their First Amendment rights, the government exempts members of the Amish faith from certain important obligations of U.S. citizenship, such as jury service.

C. Intra-religion Violence

 Defendants further contend that the Hate Crimes Prevention Act does not apply to the conduct charged in this case, namely, intra-religion acts of violence. The Defendants and the victims are all members of the Amish religion. The superseding indictment alleges that Samuel Mullet, Sr., orchestrated acts of violence to punish other Amish who did not adhere to his directives.

 There is nothing in the language of the statute that limits its reach to acts of violence perpetrated by members of one religious group against members of another. While hate crimes are often committed by members of one religious (or racial or ethnic) group against another, history is replete with examples of internecine violence. By the Defendants' logic, a violent assault by a Catholic on a Protestant, or a Sunni Muslim on a Shiite Muslim, or an Orthodox Jew on a non-Orthodox Jew, would not be prohibited by this statute. There is no logical reason why such acts of violence should be excepted from the reach of the Hate Crimes Prevention Act, and, in the absence of any language suggesting such a limitation, the Court is not going to create such an exception. *See Doe v. Boland,* 630 F.3d 491 (6th Cir.2011) (holding that a court cannot not infer, imply, or create a statutory exception where Congress did not explicitly make one).

D. Religious Freedom Restoration Act

Finally, the amicus, Center for Individual Rights, has raised the issue of whether the Hate Crimes Prevention Act violates the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb et seq., which provides that the government shall not "substantially burden a person's exercise of religion" unless the government demonstrates that the burden furthers a compelling interest by the least restrictive means. 42 U.S.C. § 2000bb–1.

 Ordinarily, the purpose of an amicus brief is to assist the court in resolving issues of law by explaining or amplifying the issues the parties raised. *United States v. Michigan,* 940 F.2d 143, 164–65 (6th Cir.1991). An amicus may not raise issues not advanced by the parties themselves, *id.* at 165, and none of the Defendants raised this argument.

 In any event, the RFRA contention fails on the merits. In the first place, violence is not a protected form of religious exercise. *Claiborne Hardware Co.,* 458 U.S. at 916, 102 S.Ct. 3409; *Beason,* 133 U.S. at 345, 10 S.Ct. 299. Furthermore, the government has a compelling interest in preventing violence, especially crimes motivated by religious animus, and the Hate Crimes Prevention Act is sufficiently narrow to address the conduct Congress found to be a national problem: violence motivated by the victim's actual or perceived religion. *See, e.g., American Life League v. Reno,* 47 F.3d 642, 656 (4th Cir.1995) (finding the Access Act to be sufficiently narrow because its prohibitions are directed only to those actions Congress found to be a national problem). The Hate Crimes Prevention Act does not prohibit activity unrelated to the problems Congress sought to address, nor does the Act prohibit speech or beliefs—only violent conduct. Accordingly, the Hate Crimes Prevention Act does not violate RFRA.

III. Conclusion

For the foregoing reasons, the Court denies the motions to dismiss. (**Docs. ## 73, 79**).

**IT IS SO ORDERED.**