LUCE & COMPANY, *S. en C.,* Appellant, *v.* MINIMUM WAGE BOARD OF PUERTO RICO, Respondent.

No. 11.    Argued June 21, 1943.    Decided September 23, 1943.

432

*Hartzell, Kelley & Hartzell* and *J. L. Novas* for appellant. *M. Rodrí-guez Ramos, Acting Attorney General, Gabriel Guerra Mondra-*

*gón*, and *Ismael Soldevila* for respondent. *Philip F. Herrick* as *amicus curiae*, on behalf of the United States of America.

MR. JUSTICE DE JESÚS delivered the opinion of the court.

Invoking the power conferred upon him by §10-A [1] of the Act to Create a Minimum Wage Board in the Department

[1] "Section 10-A.—Notwithstanding the provisions of other sections of this Act, the Governor of Puerto Rico, through a proclamation for that purpose, may require at any time that the Minimum Wage Board appoint a Minimum Wage Committee to investigate the working conditions prevailing in a certain occupation, business, or industry, where there exists or has existed within the six (6) months preceding the date of the Governor's proclamation, a state of strike, lockout, emergency, or controversy between workmen and empolyers, in regard to wages, and fix the minimum wages that shall be paid in the occupation, business, or industry in question.

"The Governor, on issuing the proclamation provided for in this section, shall set forth that the wages that the board may fix shall have retroactive effect to the date on which the laborers returned, or may return, to work.

"The Minimum Wage Board, when so required by the Governor, shall proceed immediately to appoint the Minimum Wage Committee, which after due investigation of the occupation, business, or industry in question, shall proceed to report to the board its conclusions in accordance with the provisions of Section 6 of this Act in so far as regards wages; *Provided, however,* That in these cases the Minimum Wage Committee shall submit a report to the board within fifteen (15) days or within the extension that the board may grant it, in justified cases.

"In case the committee so appointed does not submit its report within the term fixed or within the extension granted it, or in case its members do not succeed in coming to an agreement and submit a report by a majority vote, the board may declare said committee dissolved and appoint another for the corresponding investigation and report, or it can make the investigation itself and draft the corresponding report as if it were the report of the Minimum Wage Committee; *And provided, further,* That the report submitted in this last case shall be subject to the same procedure as that established in this Act.

"Once the report of the Minimum Wage Committee, or of the board, is rendered, if the latter has carried out the investigation and drafted the report, the procedure fixed by law shall be followed to issue a mandatory decree in regard to wages; *Provided, however,* That said procedure shall be subject to the following special provisions:

"(a) That the notice for the public hearing required by Section 9 of this Act shall be published at least five (5) days in advance of the holding of the same:

"(b) That the mandatory decree which the board shall issue, in accordance with Section 10 of this Act, shall be effective immediately and shall also have retroactive effect, as to the wages fixed, to the date on which the laborers in the industry in question returned, or may return, to work, if that act occurred prior to the promulgation of the decree of the board. The board shall determine the date of the return of the laborers to their work."

of Labor (Act No. 8 of 1941, Laws of 1941, p. 302, and Act No. 44 of 1942, Laws of 1942, p. 476), the Governor of Puerto Rico by Administrative Bulletin No. 805, issued a proclamation promulgated on July 28, 1942, requiring the Minimum Wage Board to appoint a Minimum Wage Committee to investigate the working conditions prevailing in the sugar industry of Puerto Rico, in order that the board might fix the minimum wages that should be paid to the workers in said industry. In the said proclamation the Governor stated that it was a matter of common knowledge that at the beginning of the 1941–42 grinding season there existed a state of strike among a large number of the workmen employed in the sugar industry, and that said workmen returned to their work with the understanding that the Minimum Wage Board would study the sugar industry of Puerto Rico and fix adequate minimum wages. It was further stated in the proclamation, as required by the cited §10-A, that the wages that the board might fix would have retroactive effect to the date on which the laborers returned to their work, which date was to be determined by the board.

At an executive meeting held on August 14, 1942, the board appointed said committee after the publication of a notice in the newspapers requiring the employers and the workmen of the industry to submit candidates for that purpose. The committee was constituted as follows: two members representing the employers, one of them having been submitted by the Association of Sugar Producers of Puerto Rico (*Asociación de Productores de Azúcar*) and another by the Farmers' Union of Puerto Rico (*Unión de Agricultores de Puerto Rico*) two representing the workmen, who were submitted by the General Confederation of Laborers of Puerto Rico (*Confederación General de Trabajadores de Puerto Rico*) and by the Free Federation of Laborers of Puerto Rico (*Federación Libre de los Trabajadores de Puerto Rico*), respectively; and one representing the public interest, who served as chairman of the committee.

Deeming it advisable to appoint also a Minimum Wage
Committee in accordance with §6[2] of the Act, in order to
investigate the normal needs of workers employed in said

[2]"Section 6.—Whenever the wages paid in any occupation, business, or
industry, or in any operation, branch, process, or activity thereof, are insufficient
to satisfy the normal needs of workers and are detrimental to the maintenance
of the minimum standard of living necessary for their health, efficiency, and
general well-being, it shall be the duty of the board to appoint a Minimum
Wage Committee composed of two representatives of the employers to be sub-
mitted by the employers, and two representatives of the workers in said occupa-
tion, business, or industry, or in the operation, branch, process, or activity of
said occupation, business, or industry, to be submitted by the workers, and of
a fifth member in representation of the public interest, who shall be the chairman
of the committee.

"The members of said minimum wage committee shall receive a per diem
of five (5) dollars whenever they meet on official business, and they shall be paid
such traveling expenses as may be necessary for the discharge of their duties.

"The board shall promulgate rules and regulations relative to the selection
of the members of said committees and to the proceedings thereof, and shall
have exclusive jurisdiction over all questions that may arise as to the validity
of the proceedings of, and the recommendations made by, said committees. The
proceedings and deliberations of the minimum wage committees shall be put
in writing for the use of the board and shall be admissible as evidence in any
proceedings before the board.

"The board shall furnish the minimum-wage committees with adequate
legal, accounting, stenographic, and clerical assistance, and such other personnel
as may be necessary to carry out their work.

"When directed by the board, it shall be the duty of any minimum wage
committee to investigate the labor conditions prevailing in such occupations,
businesses, or industries as the board may direct, and to report its findings to
the board, including the following:

"(1) An estimate of the minimum wage indispensable to satisfy the normal
needs of workers employed in the occupation, business, or industry in question
and to maintain the minimum standard of living necessary for their health,
efficiency, and general well-being.

"(2) The number of working hours in each day in the occupation, business,
or industry in question consistent with the health, safety, and well-being of
such workers.

"(3) Labor conditions required for the maintenance of the health, safety,
and well-being of workers in said occupation, business, or industry.

"Every minimum-wage committee shall submit a report to the board within
a period of three (3) months or within such extension of time as the board
may grant in justified cases. In case any minimum-wage committee fails to
submit its report within the prescribed period, or within such extension of time
as may be granted to it, or in case the members thereof are unable to agree
and to submit a report by a majority vote, the board may declare said committee
dissolved and appoint another to make the corresponding investigation and
report."

industry, the number of working hours in each day, and the labor conditions required for the maintenance of their health, safety, and well-being, the board at a meeting held on August 21, 1942, appointed said committee which was constituted by the same persons who composed the committee appointed pursuant to the proclamation of the Governor.

After the proper newspaper notices had been published, the committee held hearings on several days during the months of August and September, 1942, in the course of which it took documentary evidence and the testimony of numerous representatives of the workmen and of the employers regarding the labor conditions prevailing in the industry. After the close of the public hearings, the committee met in executive session and subsequently submitted two reports to the board: one making recommendations in accordance with §10-A, regarding the wages that should be paid in the sugar industry as from February 16, 1942, on which date the workers on strike returned to their work, and another, in accordance with §6 recommending similar wages and in addition working hours and labor conditions, the latter report being prospective in character.

After said reports had been received by the board, the latter proceeded to distribute copies thereof among the interested parties and among all persons who applied therefor, and it also published them in the daily newspapers over ten days in advance of the date set for a hearing which began on November 25, 1942, and ended on the following December 18.

The hearing was attended by workmen and employers who represented their respective organizations and by other persons interested in the sugar industry. At the hearing there was introduced extensive evidence regarding the general conditions existing in the industry, the amount of the wages, working hours, labor conditions, production costs, marketing, transportation, insurance, and economic and fi-

nancial conditions of the industry. As a result of that evidence, the board, on February 17, 1943, promulgated the decrees numbered 2 and 3. Decree No. 2 fixed the wages applicable to the agricultural as well as the industrial phase, and it stated that they would become effective immediately and would also have retroactive effect to February 16, 1942. Decree No. 3 fixed exactly the same wages provided by No. 2 for either phase of the sugar industry[3], set forth rules regarding the working hours, daily as well as weekly, and also regarding working conditions, housing, parcels of land, and meals furnished by the employer to his workmen in the course of their employment. It expressly provided that none of the conditions set forth in the decree excused non-compliance with the stipulations of any collective agreement made between employers and workmen. Neither would it excuse violations of any law fixing higher wages or less working hours, or additional or more advantageous working conditions than those provided in the decree. The two decrees were published in the daily newspapers on February 27, 1943. A large number of employers filed separate motions for reconsideration which were dismissed upon hearing the interested parties. Thereupon eighty-three petitions for review were filed in this court, in accordance with §24 of the Act.[4]

[3] In both decrees, as regards the agricultural phase of the industry, there were established two scales of wages: a higher one for ''other than small and interior farms'' and another, lower than the former, for ''small and interior farms.'' That classification is neither arbitrary nor discriminatory. On the contrary, it tends to prevent that the determination of the wages should turn out unjust and oppressive for the holders of small interior farms whose soil is ordinarily less productive than that of the littoral farms, as the latter are better adapted to the cultivation of cane. Said classification is so reasonable that for a long time it has been followed in the collective agreements which are annually made between the workmen and the employers, as also in the determination of the wages for the year 1943, which was promulgated in accordance with the Federal statute, and which also contains two analogous scales of wages.

[4] ''Section 24.—(a) In every proceeding for the violation of any of the provisions of this Minimum Wage Act, the maximum working hours and the

■ *The principal question raised by the appellants is that the Federal Act entitled "Sugar Production and Control Act," 7 U.S.C.A., §1100 et seq., excludes Insular Act No. 8 of 1941, as amended, in so far as said insular act may affect the sugar industry.*

In order that it can be maintained that the federal statute excludes an insular act which seeks to protect the health and welfare of the public, it is not enough that the two laws should embrace the same subject matter. It is required that the insular law by its own terms or in its practical administration be in conflict with the act of Congress or manifestly

labor conditions fixed by the Board, as hereby determined, shall be considered *prima facie* as reasonable and legal and as constituting the living wage, the maximum working hours, and the labor conditions which this Act requires.

"(b) The findings of fact at which the Board acting within its powers may arrive shall, in the absence of fraud, be conclusive; *Provided,* That any person directly or indirectly aggrieved by any decree or rule of the board may apply to the latter for reconsideration within twenty (20) days after the promulgation of such decree or rule. The petition for reconsideration shall be made under oath and the same shall contain the grounds on which it is based; *Provided,* That reconsideration shall be granted only for one of the following causes:

"That the board acted without authority or beyond its powers; or that the decree, rule, or order was obtained through fraud.

"A review of the final decision which the board may render in the matter, may be obtained in the Supreme Court of Puerto Rico within a term of fifteen days after the service thereof. The court may affirm or set aside the decision of the board; but the setting aside shall be only for one of the following reasons:

"That the board acted without authority or beyond its powers; or that the decree, rule or order was obtained through fraud.

"(c) The filing of a petition for reconsideration shall operate as a stay of the decree, rule, or order in question only as to the petitioning party or parties and for a period of not more than twenty days, unless the board extends the term of the stay, for which action full powers are hereby conferred upon it.

"(d) As soon as a petition for review is filed with the Supreme Court, it shall be the duty of the board to forward to said court the original record of the case consisting of the findings of the minimum-wage committee, the record of the hearings held by the board, the decree complained of, the petition for reconsideration, and the decision rendered, as well as any other proceedings had in the case.

"The petition for review by the Supreme Court shall operate as a stay of the decree complained of, upon the filing of an undertaking to answer for the total payment of the wages involved in the proceedings plus a reasonable amount for fees in case the court sets aside the proceedings."

infringe the public policy of the federal statute. In the case of *Puerto Rico* v. *Shell Co.*, 302 U. S. 253, 82 L. ed. 235, it was said:

"In the course of the opinion rendered by this court in *Davis* v. *Beason, supra* [133 U. S. 333, 33 L. ed. 642, 10 S. Ct. 299] (p. 348), it was said: 'The cases in which the legislation of Congress will supersede the legislation of a State or Territory, without specific provisions to that effect, are those in which the same matter is the subject of legislation by both. There the action of Congress may well be considered as covering the entire ground.' This generalization was not necessary to the decision of the case, and, taken literally, cannot stand, because, as in the *Gutiérrez* case [215 U. S. 87], *it omits the element of actual conflict between the two acts of legislation.*" (P. 270) (Italics ours.)

See to the same effect the case of *Cloverleaf Co.* v. *Patterson*, 315 U. S. 148, especially the dissenting opinion of Mr. Chief Justice Stone, at page 170.

The decision in *Parker* v. *Brown*, 87 L. ed. 235, 250, goes even further than the above-cited cases when it says:

"This history shows clearly enough that the adoption of legislative measures to prevent the demoralization of the industry by stabilizing the marketing of the raisin crop is a matter of state as well as national concern and, *in the absence of inconsistent Congressional action,* is a problem whose solution is peculiarly within the province of the state. In the exercise of its power the state has adopted a measure appropriate to the end sought. The program was not aimed at nor did it discriminate against interstate commerce, *although it undoubtedly affected the commerce by increasing the interstate price of raisins and curtailing interstate shipments to some undetermined extent.* The effect on the commerce is not greater, and in some instances was far less, than that which this Court has held not to afford a basis for denying to the states the right to pursue a legitimate state end. (Citing authorities.)" (Italics ours.)

It is worthy of notice that, notwithstanding the admission made in the above-quoted excerpt that the state legislation affected the commerce between the states by increasing the price of raisins and curtailing interstate shipments to some

undetermined extent, notwithstanding such circumstances, we repeat, the Court concluded that the conflict between the state law and the federal act was not so substantial as to preclude the coexistence of both statutes. There is no doubt, then, that in order that the federal act should exclude the insular law, it is not enough that the two statutes cover the same subject matter, but it is necessary that the insular law by its own terms or in its practical administration be in *substantial* conflict with the act of Congress, or manifestly infringe the public policy of the said statute.

██ Having established the foregoing principle, we will now proceed, to determine whether such conflict really exists or whether on the contrary both the federal and the insular statutes may harmoniously subsist.

The appellants in their briefs, as well as in their oral arguments, when seeking to exclude the possibility of any insular legislation that might affect the sugar industry, start from the premise that the federal statute is a harmonious whole which covers all the phases of the sugar industry and that any interference with its organization will affect the "delicately balanced organism and will throw out of balance the whole regulating machinery." Relying on the supposed delicate structure, the appellants argued that the fixing by the board of a higher minimum wage that the one determined by the Secretary of Agriculture pursuant to the federal statute might affect the production in Puerto Rico and, consequently, alter the stabilization of the sugar market in the United States.

If anything clearly appears from the federal statute in question is the foresight and discernment of its framers, who vested it with such flexibility as to enable it to be applicable to any emergency, by conferring on the Secretary of Agriculture for this purpose a wide discretion in the application of its various provisions. Thus we see that §1111 sets up standards whereby the Secretary may determine the

amount of sugar required to meet the consumption of this article in the continental United States; that §1112 confers on him power to fix the quotas for domestic as well as foreign areas; that §1113 vests him with authority to determine the amount of sugar that will be required to meet the local consumption in Hawaii and Puerto Rico; and, lastly, that §1114 authorizes him to make any redistribution that might be advisable to cover a deficit in any domestic or foreign area.

It is true that at present the quota system has been temporarily discontinued, but this does not affect either the stabilization of the market, because the Office of Price Administration (OPA), in the exercise of the authority conferred upon it by the "Emergency Price Control Act," has fixed at $3.74 per hundredweight[5] the price of sugar, and any shortage in the production of such article from Puerto Rico may be easily supplied from the other producing areas. Of course, for the sake of argument we are assuming, contrary to the legal presumption that the board will perform its duty, that it will fix such high wages as to injure the production in Puerto Rico. It may perhaps be advisable to state here that, according to the estimates made by the Minimum Wage Board of Puerto Rico, the wage increase provided for the agricultural phase by the decrees under consideration is approximately 14.9 per cent higher than the amount fixed by the Secretary of Agriculture for 1942, and that the one decreed for the industrial phase amounts to 9.5 per cent over the wages paid under the collective agreement entered into with the Free Federation of Laborers of Puerto Rico. This increase in wages amounts to 1.5 per cent of

---

[5] Paragraph 6 of decree No. 3 provides that in the event that the price of sugar should exceed or fall below $3.74, such increase or reduction shall be distributed on the basis of 50% to the farmer or producer and 500% among the laborers of said farmer or producer, which measure seems to us reasonable if we take into account the purpose of the act and the fact that, as was determined by the Board 45% of the cost of production corresponds to the payment of wages.

the total cost of production for 1942, according to the estimates of the board.

The Federal statute, in subchapter III entitled "Conditional Payment Provisions," imposes as conditions precedent to the receipt of the subsidy, that those farmers who may wish to enjoy it, comply with certain restrictions regarding child labor; that they pay the minimum wage fixed by the Secretary of Agriculture; and that they carry out certain farming practices tending to preserve and improve the fertility of the soil, and other practices consistent with the reasonable standards of the farming community in which the farm is situated.

The purpose of the federal statute when fixing a minimum rate is to prevent the payment of a wage below the one so fixed, but not the payment of a higher and reasonable one for the benefit of the worker. Hence, it was provided by the War Food Administration, when announcing the minimum wages for the calendar year then current, in Part 802, entitled "Determination of fair and reasonable wage rates for persons employed in the production, cultivation, or harvesting of sugarcane in Puerto Rico during the calendar year 1943," promulgated on June 25, 1943, under the heading "General Provisions," that—

"If the producer and laborer agree upon a wage rate for any class of work *higher* than that prescribed herein, *payment in full of the agreed upon rate* must be made to qualify the producer for payment." (Italics ours.)

Since it has not been shown to us that any essential conflict exists between the federal and insular statutes, or in the administration of said statutes notwithstanding the fact that both cover the same subject matter, it must be concluded that both may validly coexist.

■ 2. *The appellants challenge the validity of Act No. 8 of 1941, on the ground that it contains an unconstitutional delegation of powers because of its failure to fix a limita-*

*tion or adequate standards for the exercise of the powers delegated to the board and to the minimum wage committees.*

Section 12 of the Act in question, as amended by Act No. 9 of March 20, 1942 (Laws of 1942, p. 300), sets up the standards whereby the board must be guided in the administration of the law. In its pertinent part it reads as follows:

"Section 12. In fixing minimum wages, the board shall take into consideration the cost of production, the financial and economic conditions of the industries or branches of production affected and the market fluctuations, as well as the special conditions prevailing in the zone or area in question.

"On recommendation of the corresponding Minimum Wage Committee, the board may classify the works in any occupation, business, or industry according to the nature of the services to be rendered, and approve minimum-wage scales suitable for different kinds of work, for the purpose of fixing for each classification the highest rate of minimum wage compatible with the purposes of this Act. The board may also approve different minimum wages for different zones or districts when, in the judgment of the board, such differentiation may be advisable due to the conditions existing in said zones or districts, provided that such action does not give competitive advantage to another or other zones or districts; *Provided, however,* That in approving the minimum wage for any occupation, business, or industry, the rate fixed shall be uniform for every occupation, business, or industry of the same class, category, or importance in the zone or district in question.

"       *       *       *       *       *       *       *

"In the sugar industry, and in any other industry, business, or occupation in which it may be possible to do so, the board shall fix the basic relation which should exist between the price of the product and the wages, whether by taking the semi-monthly or monthly averages of said price, or by any other means which the board may consider proper, to carry out the purposes of this Act, with a view to justice for workers and stability and prosperity for industries."

Regarding the minimum wage committees, §6 sets up the standards to be followed by them when making their recom-

mendations to the board. Said §6 in its pertinent part reads as follows:

"When directed by the board, it shall be the duty of any minimum wage committee to investigate the labor conditions prevailing in such occupations, businesses, or industries as the board may direct, and to report its findings to the board, including the following:

"(1) An estimate of the minimum wage indispensable to satisfy the normal needs of workers employed in the occupation, business, or industry in question and to maintain the minimum standard of living necessary for their health, efficiency, and general well-being.

"(2) The number of working hours in each day in the occupation, business, or industry in question consistent with the health, safety, and well-being of such workers.

"(3) Labor conditions required for the maintenance of the health, safety, and well-being of workers in said occupation, business, or industry."

It appears that the appellants, doubtless influenced by the fact that in the federal statute entitled "Fair Labor Standards Act," interpreted in *Opp Cotton Mills Inc.* v. *Administrator*, 312 U. S. 126, 85 L. ed. 624, Congress deemed it proper to provide that the minimum wage to be fixed by the Administrator should not exceed 40 cents nor be less than 30 cents per hour, have thought that a similar limitation is indispensable in the present case so that the delegation of powers may be a valid one.

In this connection, it is advisable to quote from Professor Burdick's "The Law of the American Constitution," at page 152:

"Present day conditions, with their great complexity of personal and economic relations, together with the rapidly increasing governmental supervision of personal and especially of corporate conduct in the interest of the community at large, have made it practically impossible for legislatures to provide for all the detailed application of the rules and regulations which they adopt. Furthermore, such application can be much more satisfactorily made by persons who are experts in given fields, and who devote their time to the consideration of the problems within those fields. These considera-

tions have led legislatures to delegate a great deal of the power that they might exercise to administrative officers and commissions, and this they may constitutionally do as long as they lay down the guiding principles and leave only to the administrative agency the application of such principles to facts as they arise.

*"The authority so delegated may be very extensive, and the guiding principles which are to govern may be laid down in very broad terms."* (Italics ours.)

Thus we see that in the federal statute entitled "Communications Act," of 1934, the standards to be followed by the Federal Communications Commission are set forth in §303 of the Act as follows:

"Except as otherwise provided in this Act, the Commission from time to time, as public convenience, interest, or necessity requires, shall—

"(*a*) Classify radio stations;

"(*b*) Prescribe the nature of the service to be rendered by each class of licensed stations and each station within any class;

"    *    *    *    *    *    *    *

"(*f*) Make such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the provisions of this Act . . . .;

"(*g*) Study new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest;

"    *    *    *    *    *    *    *

"(*i*) Have authority to make special regulations applicable to radio stations engaged in chain broadcasting;

"    *    *    *    *    *    *    *

"(*r*) Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this Act . . . ."

From a comparison between the standards set forth in the federal statute above referred to and those provided by our Legislature in Act No. 8 of 1941, it will be readily seen that the ones contained in the Federal Communications Act are much broader. Neverthelss, in the recent case of *National Broadcasting Co. et al.* v. *United States et al.,* decided

by the Supreme Court of the United States on May 10th last, that Court, speaking through Mr. Justice Frankfurter, declared the said standards to be sufficient for the purpose of a delegation of powers and said:

."The criterion governing the exercise of the Commission's licensing power is the 'public interest, convenience, or necessity.' Sections 307 (a) (d), 309 (a), 310, 312."

The Court further said:

"The Commission was, however, not left at large in performing this duty. The touchstone provided by Congress was the 'public interest, convenience, or necessity,' a criterion which 'is as concrete as the complicated factors for judgment in such a field of delegated authority permit."

See to the same effect *Federal Radio Com.* v. *Nelson Bros. B. & M. Co.*, 289 U. S. 266, 77 L. ed. 1166.

In the case of *McCrew* v. *Industrial Commission* (Utah, 1938), 85 P.(2d) 608, the standard provided by the Legislature in a statute relating to wages and working hours for women and children engaged in the retail trades, was that the wages paid in the industry *should not be inadequate to supply the cost of proper living or that the hours of employment should not be prejudicial to the health, morals, or welfare of the workers.* As in the case at bar, in the Utah case the constitutionality of the law was challenged, on the ground that it was an unconstitutional delegation of legislative power. In upholding the sufficiency of the standard provided by the Legislature, in a concurring opinion by Mr. Justice Wolfe, it is said:

"I also agree that the case presents no such delegation of legislative powers as would render it unconstitutional. A primary standard or guide is provided. The wage must be one 'not less' than that adequate to supply women and minors the necessary cost of proper living. This must be construed to mean that wage which will provide the necessary cost of a proper living. *The standard does not need to be mathematical or exact* or one by which only one conclusion can be reached. The standard here provided is hardly less

definite than in the case where the President was required to determine whether he deemed duties or other inactions imposed by other governments on United States products to be reciprocally unequal or unreasonable; . . . . or authority on the part of the Secretary of Treasury 'Upon recommendation of a board of experts *to establish uniform standard of purity, quality and fitness* for consumption of all kinds of teas imported in the U.S. (*Buttfield* v. *Stranaham,* 192 U.S. 470, 24 S.Ct. 349, 48 L. Ed. 525) . . .' "

Cf. *In re Van Hyning* (Mich. 1932) 241 N. W. 207, 208.

Considering the nature and purpose of the insular legislation involved, it can not be seriously contended that the standards provided by our Legislature are so vague and indefinite that they amount to an unconstitutional delegation of power.

■■ Having disposed of the foregoing matter, we will now turn to the next.

3. *Whether or not the provisions of §10-A, added to Act No. 8 of 1941 by Act No. 44 of 1942, which became effective on July 23 of that year, are applicable to a strike which took place and ended before the enactment of said Section.*

The object of this attack is the annulment of decree No. 2 which, as we have said, was issued to have retroactive effect to February 16, 1942, the date on which, according to the board, the strike mentioned in the Governor's proclamation, to which we have already referred, ended.

As stated at the beginning of this opinion, the Governor issued the above-mentioned proclamation on July 29, 1942, on the ground that, as alleged, a strike had existed which, as claimed by the board itself, had come to an end on February 16, 1942. Let us now see whether from the context of §10-A there appears the legislative intent that said Section be applicable to a state of facts which had completely ceased to exist by February 16, 1942. Section 1 of Act No. 44, approved April 23, 1942, *supra,* consists of a statement of motives which it is well to keep in mind for the purpose of the interpretation of said §10-A. Section 1 reads as follows:

"Section 1.—*Statement of Motives*—Without prejudice to the sacred right of striking, which belongs to workmen in order to better their living or working conditions, it is advisable and necessary to insure the permanence of industrial activities in Puerto Rico and to prevent the workmen from leaving their work when controversies arise between them and their employers in regard to wages, which controversies may be solved through the prompt fixing of reasonable wages. For such purpose, it is the duty of the State to determine proceedings which guaranteeing to the workmen their right to claim better compensation, permit them to continue receiving the means indispensable for meeting their needs, and permit the industry to continue using the services of such workmen until their claims are aired. In times of emergency, when the uninterrupted activity of all industries is still more necessary, the establishment of special proceedings for the prompt fixing of wages, which, being applied in some cases with a retroactive effect, thus avoid the stoppage of the industry or the temporary deprivation of the workmen of their means of livelihood, is made more advisable."

Section 10-A in its pertinent part reads thus:

"Section 10-A.—Notwithstanding the provisions of other sections of this Act, the Governor of Puerto Rico, through a proclamation for that purpose, may require at any time that the Minimum Wage Board appoint a Minimum Wage Committee to investigate the working conditions prevailing in a certain occupation, business, or industry, where there exists or has existed within the six (6) months preceding the date of the Governor's proclamation, a state of strike, lockout, emergency, or controversy between workmen and employers, in regard to wages, and fix the minimum wages that shall be paid in the occupation, business, or industry in question.

"The Governor, on issuing the proclamation provided for in this section, shall set forth that the wages that the board may fix shall have retroactive effect to the date on which the laborers returned, or may return, to work."

It is a universal principle of law, embodied in §3 of the Civil Code, that civil statutes of a substantive nature shall not have a retroactive effect unless they expressly so provide, and even then, in no case shall they prejudice rights acquired under the provisions of prior legislation.

If §10-A which we are discussing is examined it will be readily seen that it fails to provide, either expressly or even impliedly, that it should have a retroactive effect. On the contrary, the pertinent part of the statement of motives, as well as the purpose of the law itself, clearly show that such was not the intention of the lawmaker. The evident purpose of the law, as the same appears from the statement of motives, is to prevent laborers from leaving their work while their claims are pending determination, thus depriving themselves of the means indispensable to provide for their needs, while at the same time they paralize the industry by depriving it of their labor. Such being the purpose of the law, it is easy to understand that its provisions can have no application to a situation which it is unnecessary to prevent, nor could it be prevented, because it had come to an end long before the act itself went into effect. But assuming that it was the legislative intent to give §10-A a retroactive effect, even so we would have to hold that, in so far as said Section should be applied to contracts for services entered into and executed, as in this case, before the same went into effect, it would be unconstitutional, since it would deprive the employers of their property without due process of law. The reason for this is obvious; it is the same that was adduced by the Supreme Court of the United States when it held unconstitutional a law which sought to impose a tax on gifts given before it became effective. See *Welch* v. *Henry,* 305 U. S. 134, 147, extensively cited in *Ballester* v. *Court of Tax Appeals,* 61 P.R.R. 460. The contracts for services, entered into between employers and workmen in accordance with a collective agreement, were executed six months before the statute we are now considering went into effect. It was impossible for the employers to determine beforehand the wages which th Minimum Wage Board would subsequently fix. Therefore, it would be unjust and arbitrary to compel them to pay a wage which, if known to them beforehand, might

have induced them not to contract for the services of the laborers, or in case that the requirements of their business compelled them so to do, they might then have had an opportunity to avail themselves of other means in order to set off the wage increase. Such executed contracts, *facta praeterita* as the Romans used to call them, can not be impaired by subsequent laws or decrees without violating the most elementary principles of justice.

We can readily notice the difference between the case at bar and those where the validity of laws imposing or increasing income tax rates, with retroactive effect, has been upheld, for as we said in the *Ballester* case, *supra,* we can not assume that a taxpayer will reject net income even if he knows that subsequently such income will be the subject of a new tax or of an increase in the tax in force at the time of receiving said income.

From what has been said, it must be concluded that, apart from the matter which we will discuss further on in this opinion, decree No. 2 is null and void for lack of jurisdiction on the board to issue it.

■■■■ 4. *The appellant contends that at the hearing held by the board, immaterial and irrelevant evidence was admitted over appellant's objection and exception, in violation of the constitutional guarantee of due process of law.*

It appears from the evidence that when the Minimum Wage Committee began the investigation referred to in §6 of the Act, the board handed to it a study of the sugar industry of Puerto Rico, prepared by various experts in the field. Then the committee, in rendering its report to the board, attached thereto all the testimony and other *ex parte* evidence which it had received during its investigation. Subsequently, at the hearing prescribed by §8, the board, over the objection of appellants, received in evidence the above-mentioned study of the sugar industry, as well as the *ex parte* testimony and other evidence taken by the committee

at the investigation. The appellants urge that the board violated §6 of the Act when it handed over and placed at the disposal of the committee the said study; and that it also erred in admitting the ex parte testimony and other evidence introduced before the committee without giving the appellants an opportunity to cross-examine the witnesses, despite appellants' timely request therefor.

It is the duty of the committee to investigate the working conditions prevailing in the sugar industry, and, as a result of such investigation to submit to the board a report containing recommendations as to the minimum wage indispensable to satisfy the normal needs of the workmen, as well as to the number of working hours compatible with their health, safety, and well-being, and regarding the labor conditions required for the maintenance of their health, etc. This being so, we fail to see how, in the absence of a legal provision to the contrary, the board should be precluded from furnishing the committee with said study, thus cooperating with it in order that it may carry out its purpose. The fact that the board should submit to the committee any work of the nature indicated does not mean that the committee must necessarily accept the conclusions set forth in said work, if it deems them erroneous.

Section 6 expressly provides that "the proceedings and deliberations of the minimum wage committees shall be put in writing for the use of the board and *shall be admissible as evidence in any proceedings before the Board.*" (Italics ours.)

The law does not prescribe that the committee must hold hearings. It simply directs it to make an investigation, and in order to carry it out, it is logical that the committee should take the testimony of those persons who can shed light on the subject of the investigation. Therefore, those sworn statements taken by the committee, as well as the study submitted to it by the board, all of which was used in the prep-

aration of the report that it rendered in compliance with the law, evidently form part of its proceedings and deliberations, and as the Legislature deemed it proper to lay down the rule of procedure that said proceedings and deliberations should be admissible as evidence before the board, the latter acted correctly in admitting the same. It was not indispensable, save in the case of fraud or error, that as a condition precedent to such admission the board should summon the diverse persons who made said statements in order that they might be cross-examined by any party interested in the proceedings before the board, just as it is not indispensable to the admission in evidence of a public document, except under the above-stated circumstances, that the officer who issued the same should be brought before the court in order to be cross-examined by any party interested in said document. The law, as we have seen, only prescribes that said deliberation and proceedings are admissible in evidence; but the weight or credibility to be accorded to the document rests in the sound discretion of the board. Although the interested parties, as we have said, can not demand that as a condition precedent to the admission of the proceedings and deliberations of the committee, the persons who testified before that body be subjected to cross-examination, it is obvious that once the same have been admitted, said interested parties may introduce all pertinent evidence in order to contradict them, including the testimony of those persons who testified before the committee for or against the said interested parties. This being so, since the appellants had requested that certain witnesses who testified before the committee be summoned for examination by them before the board, the latter would have erred if it had refused to summon them, once it was shown that said testimony was material to the controversy, and that due to the way in which it appeared in the report, it was unduly prejudicial to the substantial interests of the appellants. Since it does not ap-

pear from the record that said error has been prejudicial to the substantial rights of the appellants—for the materiality of such evidence was not shown—, we must hold that the assigned error is not in itself sufficient to cause a reversal.

5. *The appellants contend that the Minimum Wage Board, as created by law, deprives the interested parties of a fair and impartial hearing, in violation of §2 of the Organic Act of Puerto Rico.*

This contention of the appellants is predicated on the provisions of §2 of the Act, in accordance with which the board shall consist of four representatives of the employers' interests, four representatives of labor, and one representative of the public interests, who shall be its chairman. It is argued that the members thus appointed are persons necessarily interested in defending the class which they represent, and therefore can not act as a fair and impartial board.

At first sight, the term "representatives" of the workmen and employers conveys the idea that the members thus designated will tend to procure within the board the greatest benefits for the class they represent. But this is not so. Their function is to decide the matters pending before the board in accordance with the evidence submitted, and no decision of the board will be valid unless the same is based on substantial evidence. The best proof that said members are not predisposed against any class not represented by them is the circumstance present in this case, that decree No. 3 was approved by the unanimous vote of the nine members.[6] If an equal number of members is appointed from each class, it is because, being affiliated to such class, they are familiar with its particular problems and with the needs and living conditions of the workers.

---

[6] Said decree was not signed by Mr. Serrallés, a concurring member of the board, because he had to leave hurriedly for the United States before the decree was signed.

Neither in the research we have made nor in the briefs filed by the parties have we been able to find any decision which holds that the creation of an administrative board in the manner provided by the insular act is unconstitutional. On the contrary, in the federal government, as well as in various state governments, there are provisions relative to the creation of administrative boards which are similar to those contained in Act No. 8 of 1941.

6. *It is urged in other petitions, and it might be contended in the proceeding herein, that decrees Nos. 2 and 3, and Act No. 8 of 1941, are null and void by virtue of the provisions contained in the federal statute, known as the "Federal Inflation Control Act," approved October 2, 1942* (50 U.S.C.A. App. 961).

In support of their contention said appellants urge that certain orders of the National War Labor Board, to which we shall refer presently, are void for lack of jurisdiction to issue them. The orders in question are numbered 7 and 8, issued on November 3, 1942, and read as follows:

"General Order 7. Since Title VI, Section 1 of the Executive Order No. 9250, dated October 3, 1942, states that 'nothing in this Order shall be construed as affecting the present operation of the Fair Labor Standards Act', and since statutes and orders of the duly constituted authorities of the several states fixing minimum rates for certain types of workers carry out the true purposes and intent of the Fair Labor Standards Act, and are designed and intended to eliminate substandards of living within the meaning of section 2 of Title II Executive Order No. 9250, the National War Labor Board hereby approves increases in wage and salary rates made in compliance with such statutes and orders."

"General Order 8. Exercising the authority vested in the National War Labor Board by Section 401.14 of Part 4001, Regulations Relating to Wages and Salaries, issued on October 27, 1942, by the Economic Stabilization Director and approved by the President, and deeming it necessary for the effective administration of the Act of Congress of October 2, 1942, the Board hereby determines that adjustments in any wages or salaries over which this Board has jurisdiction and which are paid in any territory or

possession of the United States, except Alaska, are exempted from the operation of the said regulations and therefore may be made without the approval of the Board.''

The application of General Order No. 8 to Puerto Rico is so manifest that it is unnecessary to decide whether the above-quoted Order No. 7 is likewise applicable. Therefore, the only question left for us to decide is whether or not said General Order No. 8 was lawfully issued.

In the brief filed by the United States of America as *amicus curiae,* and signed by the District Attorney of the United States District Court for Puerto Rico, a detailed analysis is made of the federal legislation from which General Orders Nos. 7 and 8 derive their validity, and from said brief we have made the following summary:

The War Labor Board was established by the President through Executive Order No. 9017. Said Executive Order, which created said board within the agency known as the Office of Emergency Management, prescribes the form in which the board shall be constituted and establishes the procedure to be followed to adjust and settle labor disputes. At the time of its creation, the sole purpose of the War Labor Board was to settle the disputes through peaceful means so that strikes or lockouts could be avoided during the war period. The board was granted power to promulgate adequate rules and regulations for the execution of its duties.

The National War Labor Board was officially recognized by Congress when it passed the Emergency Price Control Act, approved January 30, 1942, which was amended by the Inflation Control Act, approved October 2, 1942. The latter statute, primarily directed towards the stabilization of salaries, seeks to supplement the price stabilization provisions contained in the Price Control Act, and thus to create a uniform national standard, aimed at preventing the increase in prices and salaries which would be the logical con-

sequence of an increase in the purchasing power and reduction of stocks in hand as a result of the war.

The Inflation Control Act authorized and directed the President to issue general orders stabilizing prices, wages, and salaries, such stabilization to be so far as practicable on the basis of the levels which existed on September 15, 1942. The President was authorized to make such adjustments as were deemed necessary to aid in the effective prosecution of the war and to correct gross inequities. To that end, the President may promulgate regulations, and may exercise any of the powers conferred upon him by the Act through such department, agency or officer as he may direct. In the exercise of the powers granted to him by said Act, the President created an agency known as the Office of Economic Stabilization, under the direction of a Director of Economic Stabilization, who was invested with authority to formulate and develop a national policy regarding prices, wages, salaries, etc., in order to avoid an increase in the cost of living, lessen the migration of workmen, and facilitate the prosecution of the war. Lastly, on December 27, 1942, the Director of Economic Stabilization, making use of the powers thus conferred upon him, issued an order directing the National War Labor Board to determine, among other things, whether a payment of wages is made in violation of the Inflation Control Act or of any order or regulation issued in pursuance thereof. Paragraph 4001.14 of the order in question reads as follows:

"*Territories and possessions.* The Board and the Commissioner shall have the authority to exempt from the operation of the regulations in this part any wages or salaries paid in any Territory or possession of the United States where deemed necessary for the effective administration of the Act and the regulations in this part."

This order of the Director of Economic Stabilization has the same force as an Executive Order issued by the Pres-

ident, was expressly approved and signed by the President, and supersedes any conflicting provisions contained in Executive Order No. 9250.

From the foregoing, it may be readily seen that the National War Labor Board was legally authorized to issue General Orders Nos. 7 and 8 above transcribed, especially No. 8, between which and our Act No. 8 of 1941 no conflict exists.

7. *The appellant contends that it was deprived of its rights to a fair trial in violation of the constitutional guarantee of due process of law.*

As appears from the record and is admitted by counsel for the board, ever since November 25, 1942, when the hearings before it began, out of the nine members forming the board, only one, the chairman, attended all said hearings. Two of the members, Messrs. Colón Gordiany and Fiz Jiménez, only attended the first session, and apparently without being acquainted with the evidence introduced and without having heard the oral arguments submitted by the parties, participated in the decision whereby the board issued decrees Nos. 2 and 3, which have given rise to this appeal. The appellants repeatedly objected and caused the absence of the various members to be entered on record, and subsequently, in the motion for reconsideration which they submitted to the board and which was denied as already stated, they expressly alleged the disqualification of the two members above-named, on the aforesaid ground of having failed to hear either the evidence or the oral arguments. Said members stated that they were familiar with the evidence from the record. The appellants then moved for leave to produce the testimony of the stenographers who took down the evidence adduced, in order to challenge the statements of the two members in question, the appellants asserting that even at the time when they were offering such testimony, the stenographic notes had not yet been typed. The

board refused to allow the introduction of said testimony. To the unequivocal assertion of the appellants as aforesaid, the board replied in its main brief, pages 79–80, as follows:

"It will do for those members of the board who did not hear the evidence in whole or in part, to become familiar with it by asking the stenographer to read or type for them the record, just as judges do when they want to straighten out in their minds any portion of the evidence of which they don't have a clear recollection. The assertion of some of the appellants that the record had not been typed at the time the decrees were rendered, without pointing out which part of the record had not been typed, is unlikely, especially when two months had elapsed between the closing of the hearing and the issuance of the decrees, during which time the members of the board could have asked the stenographers to read for them their notes, just as judges do under similar circumstances. The evidence on this point offered by petitioners at the oral arguments of their motions for reconsideration, was insufficient and inadmissible, as the board had made it known that such hearing— *which is not required by law*—was called for the sole purpose of hearing the oral argument of such parties as desired to appear. If the case had been opened for admission of evidence regarding said matter, for the same token evidence would have been admissible on all other questions of fact raised in the motions for reconsideration, thus holding the hearing twice. Moreover, the hearing was announced for the exclusive benefit of those persons or entities who filed motions for reconsideration, and not for the public or other parties who might possibly be interested in the matter. Otherwise the board would have violated the 'due process' so often invoked by the appellants. If evidence was to be offered, which was never announced, the proper procedure should have been followed."

Let us now see what the law provides regarding the procedure to be followed by the board, once the minimum wage committee has rendered its report:

"Section 8.—Taking as a basis the report rendered by the minimum-wage committee, *and after a public hearing of the interested parties and of the public,* the board shall have power to fix:

"(1) The minimum wage rate which must be paid to workers employed in the occupation, business, or industry in question, or in

the operation, branch, process, or activity of the occupation, business, or industry in question.

"*     *     *     *     *     *     *

"(2) The maximum working hours consistent with the health, safety, and general well-being of workers in said occupation, business or industry; . . .

"(3 Labor conditions required for the maintenance of the health, safety, and well-being of workers in said occupation, business, or industry.

"Section 9. As soon as the board shall fix the time and place for the holding of a public hearing for the purpose of considering and determining the matters stated in the preceding section, it shall proceed to give notice of said hearing by an announcement which shall be published ten (10) days in advance in at least one newspaper of general circulation in the Island.

"Section 10.—After holding said hearing, the board shall issue a mandatory decree . . ."

Unquestionably, said public hearing is a jurisdictional requisite that must be fully complied with by the board before it can issue a valid mandatory decree. That hearing must not be merely a sham proceeding in which, ignoring matters of substance, it is only sought to comply with the form. It is not an indispensable requisite that all the members of the board should be present while the evidence is heard. It is necessary, however, that when deliberating and rendering a decision all the members who participated therein should be acquainted with the evidence as well as with the arguments of the parties, since otherwise it can not be said that a public hearing has been previously held, as required by law. It was known to the whole board that the two members who had been challenged had only attended the first session of the public hearing, and that the sessions continued for several days, the evidence produced being so voluminous that it covers four large volumes, or a total of 1471 pages.

There is no doubt that the two members in question, as well as those who failed to attend the sessions regularly,

were disqualified to participate in the deliberations and decision of the board, unless it be shown that all of them had at least read the stenographic notes and were familiar with the oral arguments. If, contrary to what the appellants purported to show, the record had been typed prior to the hearing of the motion for reconsideration, and all of the members had a reasonable opportunity to read it, and if they had actually read it, the controversy would have been easily and speedily settled by hearing the testimony of the stenographers and that of the challenged members, provided the former testified that they had had the record available within a reasonable time in advance of the rendering of the decision by the board. If such evidence were to establish the truth of the assertion of the appellants, why adopt the well-known tactics of the ostrich, and attempt at self-deception by precluding the hearing of evidence upon the result of which the validity of the decrees rendered might depend?

As stated by Robert M. Benjamin in his recent work "Administrative Adjudication in the State of New York," page 10, it is the duty of administrative boards or tribunals not only to do justice but also to act in such a way that interested parties may realize that justice has been done. To this end the procedure followed may contribute as much as the result of the decision itself.

The case of *Morgan* v. *United States,* 298 U. S. 468, 80 L. ed. 1288, cited by the appellant, is fully applicable to the facts of the present case. There the Secretary of Agriculture issued an order fixing the maximum rates to be charged by market agencies for buying and selling livestock at the Kansas City Stock Yards. Under §310 of the Packers and Stockyards Act, the Secretary may on his own initiative or upon complaint, make an investigation. If as a result thereof he finds that any rate, charge, regulation, or practice of a stockyard owner or of a market agency in connection with such business is or will be unjust, unreasonable, or discrim-

inatory, the Secretary may determine and prescribe the rate or rates, charge or charges which they may thereafter be entitled to collect. Likewise, he is empowered to fix the maximum or minimum, or maximum and minimum, that may be charged, and to prescribe what regulation or practice will be just, reasonable, and non-discriminatory.

In pursuance of the power conferred on him by said Section, a proceeding was instituted by an order of the Secretary of Agriculture, directing an inquiry into the reasonableness of existing rates. Testimony was taken and an order prescribing rates was subsequently issued. An application for rehearing was made and granted, in view of changed economic conditions. After the taking of voluminous testimony a final order was made on June 14, 1933, and the Secretary denied a reconsideration thereof on July 6, 1933.

Feeling aggrieved not only by the rates fixed but also by the proceeding taken by the Secretary of Agriculture, Morgan brought suit in a federal district court to enjoin the Secretary of Agriculture from enforcing the said rates. It was alleged by Morgan in the complaint that the Secretary of Agriculture had made the rate order without having heard or read the evidence, and without having heard or considered the oral arguments or having read or considered the briefs submitted by the then plaintiffs. It was further alleged that the only information which the Secretary had as to the proceeding was what he derived from consultation with employees of his Department. The Government requested that those allegations be stricken out, and the court so ordered. The plaintiff appealed to the Supreme Court of the United States, which reversed the judgment of the district court upholding the validity of the order of the Secretary of Agriculture, as the refusal to allow the plaintiff to allege and prove the facts set forth in the stricken matter, was prejudicial error.

462

Referring to the proceeding prescribed by law to authorize the Secretary to exercise the power conferred on him by §310, *supra*, the Supreme Court said:

"The proceeding is not `one of ordinary administration, conformable to the standards governing duties of a purely executive character. It is a proceeding looking to legislative action in the fixing of rates of market agencies. And, while the order is legislative and gives to the proceeding its distinctive character (citing authorities), it is a proceeding which by virtue of the authority conferred has special attributes. The Secretary, as the agent of Congress in making the rates, must make them in accordance with the standards and under the limitations which Congress has prescribed. Congress has required the Secretary to determine, as a condition of his action, that the existing rates are or will be 'unjust, unreasonable, or discriminatory.' If and when he so finds, he may 'determine and prescribe' what shall be the just and reasonable rate, or the maximum or minimum rate, thereafter to be charged. That duty is widely different from ordinary executive action. It is a duty which carries with it fundamental procedural requirements. There must be a full hearing. There must be evidence adequate to support pertinent and necessary findings of fact. Nothing can be treated as evidence which is not introduced as such. (Citing authorities). Facts and circumstances which ought to be considered must not be excluded. Facts and circumstances must not be considered which should not legally influence the conclusion. Findings based on the evidence must embrace the basic facts which are needed to sustain the order. (Citing authorities.)

"A proceeding of this sort requiring the taking and weighing of evidence, determinations of fact based upon the consideration of the evidence, and the making of an order supported by such findings, has a quality resembling that of a judicial proceeding. Hence it is frequently described as a proceeding of a *quasi-judicial* character. The requirement of a 'full hearing' has obvious reference to the tradition of judicial proceedings in which evidence is received and weighed by the trier of the facts. The 'hearing' is designed to afford the safeguard that the one who decides shall be bound in good conscience to consider the evidence, to be guided by that alone, and to reach his conclusion uninfluenced by extraneous considerations which in other fields might have play in determining purely executive action. The 'hearing' is the hearing of evidence and argu-

ment. If the one who determines the facts which underlie the order has not considered evidence or argument, it is manifest that the hearing has not been given.''

After the case had been remanded to the lower court, there were reinstated in said complaint the allegations which that court had ordered stricken out in the former case, and the Secretary was ordered to file his answer, which he did, and thereupon a hearing was held in which, besides the evidence introduced at the previous hearing, there was received testimony bearing upon the matter reinstated in the complaint. The lower court rendered judgment on the merits in favor of the defendant, on the ground that, in accordance with the evidence, the hearing before the Secretary complied with the legal requisites. Morgan appealed again to the Supreme Court of the United States. (*Morgan* v. *United States*, 304 U. S. 1, 82 L. ed. 1129). The evidence sent up to the Supreme Court by virtue of the second appeal showed that the hearing had been held before the Secretary took office; that the latter read the evidence as the same appeared from appellants' brief; that in signing the order he did so relying on the finding of fact made by the officials of the Bureau of Animal Industry; and that the order represented his own reactions to the findings of fact prepared in said Bureau. It further appeared from the evidence that the Secretary read the summary of the evidence prepared for him in appellants' brief, and that he conferred with his subordinates who had sifted and analyzed the evidence. After stating those facts, the Court said:

''But a 'full hearing'—a fair and open hearing—requires more than that. The right to a hearing embraces not only the right to present evidence but also a reasonable opportunity to know the claims of the opposing party and to meet them. The right to submit argument implies that opportunity; otherwise the right may be but a barren one. Those who are brought into contest with the Government in a quasi-judicial proceeding aimed at the control of their

activities are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command.

"*     *     *     *     *     *     *

"Again, the evidence being in, the Secretary might receive the proposed findings of both parties, each being notified of the proposals of the other, hear argument thereon and make his own findings. But what would not be essential to the adequacy of the hearing if the Secretary himself makes the findings is not a criterion for a case in which the Secretary accepts and makes as his own the findings which have been prepared by the active prosecutors for the Government, after an *ex parte* discussion with them and without according any reasonable opportunity to the respondents in the proceeding to know the claims thus presented and to contest them. That is more than an irregularity in practice; it is a vital defect.

"The maintenance of proper standards on the part of administrative agencies in the performance of their quasi-judicial functions is of the highest importance and in no way cripples or embarrasses the exercise of their appropriate authority. On the contrary, it is in their manifest interest. For, as we said at the outset, if these multiplying agencies deemed to be necessary in our complex society are to serve the purposes for which they are created and endowed with vast powers, they must accredit themselves by acting in accordance with the cherished judicial traditional embodying the basic concepts of fair play.

"As the hearing was fatally defective, the order of the Secretary was invalid. In this view, we express no opinion upon the merits."

For the foregoing reasons, the petition for review filed herein should be granted; the decrees Nos. 2 and 3 issued by the Minimum•Wage Board of Puerto Rico should be set aside; and the case remanded to said board in order that, in accordance with the principles set forth in this opinion, it be determined, in connection with decree No. 3, whether or not the members of the board who at any time were absent from the sessions had read the pertinent portions of the record prior to the issuance of the decree, or, otherwise, to have them read said portions of the record; and, furthermore, the appellants must be granted another opportunity

for written or oral arguments, the same to be heard or read by the full board, whereupon the latter shall proceed to issue the proper decree.

Mr. Justice Snyder, although not present when the opinion and judgment were filed, participated in the conferences at which the opinion was considered, and concurs therein.