**Elijah MOHAMMAD, Plaintiff,**

v.

**Glenn B. SOMMERS, Victor Smith, Jack Conley, and Edward Joseph, Defendants.**

**Civ. A. No. 81.**

United States District Court
E. D. Michigan, N. D.
July 30, 1964.

Stuart J. Dunnings, Jr., Lansing, Mich., for plaintiff.

Charles A. Forrest, Jr., Flint, Mich., for defendant.

ROTH, District Judge.

This is a civil rights action brought by plaintiff as "head or leader of a religious society known as 'The Nation of Islam'" against three police officers and the City Attorney of the City of Flint, Michigan. He alleges that he was deprived of certain privileges and immunities guaranteed him by Amendments I, V, and Section I of Amendment XIV of the Constitution of the United States, in that while plaintiff was conducting a religious meeting at the Industrial Mutual Association Auditorium in the City of Flint, the defendants entered the building and, although requested so to do (in keeping with one of the tenets of the society), refused to surrender weapons which they had upon their persons. Plaintiff further alleges that this made it impossible for him to continue with the meeting, as one of the tenets of "The Nation of Islam" forbids the holding of any meeting where weapons are present. The plaintiff discontinued and terminated the meeting when defendants refused either to leave or to disarm, and in this action he seeks one million dollars in damages.

The defendants have filed a motion for summary judgment, which the Court will treat as a motion to dismiss. Attached to their motion are affidavits. Plaintiff has not filed counteraffidavits, and there is no genuine issue of fact.

The City of Flint has a population of some two hundred thousand, and the auditorium leased by the Industrial Mutual Association to the plaintiff is the largest such establishment in the city. It seats six thousand, and it is estimated that the number of people at the meeting involved was around twenty-five hundred.

The stated purpose of the meeting, as set forth by an insertion in the lease entered into between the Industrial Mutual Association and Muhammad Mosque (Mr. Philbert), appears as follows:

"The LESSEE covenants and agrees to use said premises for the purpose of Lecture and for no other purpose, * * *."

And paragraph 18 of the lease provides:

"The LESSEE must, at all times, comply with the rules and regulations of the Board of Fire Insurance Underwriters and with the Ordinances of the City of Flint and with the laws of the State of Michigan and of the United States of America."

City of Flint Ordinance No. 130, as amended, is entitled "An Ordinance to License and Regulate Public Exhibitions and Amusements, the Places where they are held, and Stands and Booths connected therewith." The said Ordinance appears as Section 120.1 through Section 120.14, inclusive, of the Compiled Ordinances of the City of Flint. We set out Section 120.14:

"The Chief of Police and all such constables and policemen as shall be designated by the Chief of Police shall have free ingress and egress to and from any shows, or exhibitions, licensed under the provisions of this ordinance, and to and from all licensed theaters, halls, and rinks, for the purpose of preserving quiet and good order."

For the purposes of our consideration of the case, we take the allegations of the complaint as true. So we do not come to, nor pass upon, the question of whether plaintiff and his followers belong to a religion, sect, cult, or a social or political group or association.

See C. Eric Lincoln in his "The Black Muslims in America," page 210:

"A major goal of the present Muslim leadership is to achieve general acceptance of the Movement as a legitimate religion—specifically, as a legitimate sect of orthodox Islam. * * * In pressing their demand for complete acceptance as a legitimate religion and a Moslem sect, the Muslims have their eye primarily on the white community. * * *

Religious groups in America are unfettered; only in the most extreme cases is certain quasi-secular behavior in the name of religion construed as against public policy and, as such, prohibited. * * * The more swiftly and securely they can become acknowledged as a legitimate religion, the more securely they can rely upon the counterpressures of democratic toleration and constitutional immunity."

Mr. Lincoln goes on to say that the Muslims have generally been given the benefit of the doubt, although only provisionally. Be that as it may, the motion of the defendants requires us to assume that "The Nation of Islam" is a religion and that plaintiff is its leader.

Broadly put, the issue presented is whether the complaint states a claim for relief. In order to answer this question, we look first to the authority of the state, acting through its governmental bodies and agencies, to regulate the affairs and business of the community and to provide for its moral and physical welfare. This general power of the state is basic—to dispute this is to advocate anarchy. This, we take it, is not a matter of contention here. We pass then to the more specific question of the constitutionally protected right of religious freedom.

"Religious activities which concern only members of the faith are and ought to be free—as nearly absolutely free as anything can be." Prince v. Com. of Massachusetts, 321 U.S. 158 at 177, 64 S.Ct. 438, at 445, 88 L. Ed. 645, at 658 (Mr. Justice Jackson).

■ But in the interest of the public weal, there are many limitations which bound religious freedom. Generally it can be said that these limitations begin to operate whenever activities in the name of religion affect or collide with the liberties of others or of the public, or violate public policy. Witness this but partial list of instances of such conflicts which have all been resolved against the claims of freedom of religion:

Sunday closing,

spiritualist readings,

selective service,

parading in the streets,

practice and advocacy of polygamy,

vending periodicals in the streets,

fluoridation of water,

compulsory school attendance,

child labor regulations,

compulsory vaccination,

blood transfusion,

surgery and medical attention.

■ We receive this teaching from the cases which have dealt with the claim of religious freedom as against regulation:

That if the regulation is within the police power of the state, and is a reasonable and not arbitrary exercise of that power, it will not be held to be repugnant to the constitutionally protected rights of the individual, though it may incidentally or indirectly affect such asserted right or rights.

Even the family is not beyond regulation in the public interest, as against a claim of religious liberty. Perhaps the most dramatic application of the rule of law that regulation and control in the public interest is valid as against the claim of religious freedom occurs in cases involving children and parents. As pointed out in Prince v. Com. of Massachusetts, 321 U.S. 158, page 166, 64 S.Ct. 438, page 442, 88 L.Ed. 645, page 652:

"But the family itself is not beyond regulation in the public interest, as against a claim of religious liberty. Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244; Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637. And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control by requiring school attend-

ance, regulating or prohibiting the child's labor, and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death. People v. Pierson, 176 N.Y. 201, 68 N.E. 243, 63 L.R.A. 187, 98 Am.St.Rep. 666. The catalogue need not be lengthened. It is sufficient to show what indeed appellant hardly disputes, that the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare; and that this includes, to some extent, matters of conscience and religious conviction."

See also People ex rel. Wallace v. Labrenz, 411 Ill. 618, 104 N.E.2d 769, 30 A.L.R.2d 1132, involving the administration of blood transfusion over the objection, on religious grounds, by the parents. In overruling the parental objection on the ground that such a transfusion is forbidden by the Scriptures, the Court said:

"Concededly, freedom of religion and the right of parents to the care and training of their children are to be accorded the highest possible respect in our basic scheme. * * * But 'neither the rights of religion or rights of parenthood are beyond limitation.' "

The practice of spiritualism has been put to a test and found wanting. McMasters v. State, 21 Okl.Cr. 318, 207 P. 566, 29 A.L.R. 292, involved a spiritualist reading by Mrs. McMasters putting a female employee of the county attorney's office in touch with the spirit of Minnehaha, the legendary Indian girl of Longfellow's poem "Hiawatha." Mrs. McMasters was convicted of fortune telling.

She appealed and asked that her conviction be set aside on the constitutional ground that her arrest and conviction were unlawful, as an interference with the free exercise of her religious beliefs and practices. After discussing the matter of what is a religion—and without coming to any definite conclusion respecting spiritualism—the Court said:

"But, assuming that it is a religion, religious liberty does not include the right to introduce and carry out every scheme or purpose which persons see fit to claim as a part of their religious system. No one can stretch his liberty so as to interfere with that of his neighbor, or violate police regulations or the penal laws of the land, enacted for the good order and general welfare of all the people. Liberty founded by the fathers was not license unrestrained by law. * * *

* * * * *

"Even if the purposes of this organization are religious in their nature, it is difficult to see how the practice of giving 'readings' or telling fortunes concerning the mating inclinations of men and women could be religious, in any sense."

The Selective Service Act has been subjected to the constitutional test by a follower of the teachings of the plaintiff. United States v. Mohammed, 288 F.2d 236, 7th Cir. (1961), involved the conviction of the defendant for refusing to report for civilian work as ordered by his local Selective Service Board. The defendant appealed his conviction on the ground that he was a minister of his religious sect—the Islamic Religion. The Court said (page 244):

"Freedom to believe and adopt one's chosen form of religion is an absolute right, but freedom of action in following one's concept of religion is 'subject to regulation for the protection of society'. Cantwell v. [State of] Connecticut, 310 U.S. 296, 303–304, 60 S.Ct. 900, 903, 84 L.Ed. 1213. There is here no interference with defendant's right to

adopt and believe the religion of his choice. To the extent that his freedom of desired action in the practice of his religious faith is curtailed, that curtailment is a permissible result of the selective service laws adopted and enforced for the protection of the nation. Warren v. United States, 10 Cir., 177 F.2d 596, 598–600, certiorari denied 338 U.S. 947, 70 S.Ct. 485, 94 L.Ed. 584."

The practice and advocacy of polygamy have given rise to decisions which delineate the area of constitutional freedom and state regulation. It has been held that the police power of government exercised in matters germane to the maintenance of public order cannot be suspended in order that the tenets of a religious sect may be carried out without hindrance. See such cases as Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637, relating to the disqualification to vote of persons who were members of an order or organization which advocated the practice of polygamy, where the Court said:

"The first amendment to the Constitution, in declaring that Congress shall make no law respecting the establishment of religion or forbidding the free exercise thereof, was intended to allow everyone under the jurisdiction of the United States to entertain such notions respecting his relations to his Maker and the duties they impose as may be approved by his judgment and conscience, and to exhibit his sentiments in such form of worship as he may think proper, not injurious to the equal rights of others, and to prohibit legislation for the support of any religious tenets, or the modes of worship of any sect. * * It was never intended or supposed that the amendment could be invoked as a protection against legislation for the punishment of acts inimical to the peace, good order, and morals of society. With man's relations to his Maker and the obligations he may think they impose, and the manner in which an expression shall be made by him of his belief on those subjects, no interference can be permitted, provided always the laws of society, designed to secure its peace and prosperity, and the morals of its people, are not interfered with."

See also Late Corporation of the Church of Jesus Christ of Latter-Day Saints v. United States; Romney v. United States, 136 U.S. 1, pages 49, 50, 10 S.Ct. 792, page 805, 34 L.Ed. 478, at page 493:

"It is unnecessary here to refer to the past history of the sect; to their defiance of the government authorities; to their attempt to establish an independent community; to their efforts to drive from the Territory all who were not connected with them in communion and sympathy. The tale is one of patience on the part of the American government and people, and of contempt of authority and resistance to law on the part of the Mormons. Whatever persecutions they may have suffered in the early part of their history, in Missouri and Illinois, they have no excuse for their persistent defiance of law under the government of the United States.

"One pretense for this obstinate course is that their belief in the practice of polygamy, or in the right to indulge in it, is a religious belief, and therefore under the protection of the constitutional guaranty of religious freedom. This is altogether a sophistical plea. No doubt the Thugs of India imagined that their belief in the right of assassination was a religious belief; but their thinking so did not make it so. The practice of suttee by the Hindu widows may have sprung from a supposed religious conviction. The offering of human sacrifices by our own ancestors in Britain was no doubt sanctioned by an equally conscientious impulse. But no one, on that account, would hesitate to brand

these practices, now, as crimes against society, and obnoxious to condemnation and punishment by the civil authority.

"The state has a perfect right to prohibit polygamy, and all other open offenses against the enlightened sentiment of mankind, notwithstanding the pretense of religious conviction by which they may be advocated and practised. * * *"

So, too, in the cases dealing with fluoridation of water, the courts have, in the main, turned aside contentions that such exercises of the police power violate the right to religious freedom. See annotation in 43 A.L.R.2d 453.

See also the interesting Michigan case of In the Matter of Frazee, 63 Michigan 396, 30 N.W. 72. The petitioner, a member of the Salvation Army, was arrested for an alleged violation of an ordinance, the complaint charging him and other members with parading in, upon, and through Canal and Pearl Streets, in said city (Grand Rapids), with musical instruments, banners, and flags, while singing and shouting, without having first obtained the consent of the mayor or common council of the city. Chief Justice Campbell said:

"We cannot accede to the suggestion that religious liberty includes the right to introduce and carry out every scheme or purpose which persons see fit to claim as part of their religious system. There is no legal authority to constrain belief, but *no one can lawfully stretch his own liberty of action so as to interfere with that of his neighbors, or violate peace and good order.* The whole criminal law might be practically superseded if, under pretext of liberty of conscience, the commission of crime is made a religious dogma. It is a fundamental condition of all liberty, and necessary to civil society, that all men must exercise their rights in harmony, and must yield to such restrictions as are necessary to produce that result. It is not competent to make any ex-

ceptions either for or against the body of which petitioner is a member, because of its theories concerning practical work. *In law it has the same right, and is subject to the same restrictions, in its public demonstrations, as any secular body or society which uses similar means for drawing attention or creating interest.* (Italics supplied.)

City of Manchester v. Leiby, 1 Cir., 117 F.2d 661, involved an ordinance requiring persons selling periodicals in the streets or public places to obtain identification badges. The Court held it a reasonable police regulation imposing no substantial burden upon "freedom of press" or the "free exercise of religion," in the absence of a showing of an arbitrary or improper administration of the ordinance. What the Court said in that case is peculiarly applicable to our case:

"The civil authority can never concede the extreme claim that police regulations of general application not directed against any sect or creed—however widely the regulations may be accepted as being reasonable and proper—are constitutionally inapplicable to persons who sincerely believe the observance of them to be 'an insult to Almighty God.'"

As pointed out in Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213:

"Even the exercise of religion may be at some slight inconvenience in order that the state may protect its citizens from injury."

As pointed out in Davis v. Beason, supra:

"Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. . Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a

sacrifice? Or, if a wife religiously believed it was her duty to burn herself upon the funeral pile of her dead husband, would it be beyond the power of the civil government to prevent her carrying her belief into practice? So here, as a law of the organization of society under the exclusive dominion of the United States, it is provided that plural marriages shall not be allowed. Can a man excuse his practices to the contrary, because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances." (Underlining supplied)

In Poulos v. State of New Hampshire, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105, the Supreme Court affirmed the conviction of a Jehovah's Witness for having conducted religious services in a public park without the license required by a city ordinance.

"There is no basis for saying that freedom and order are not compatible. That would be a decision of desperation. Regulation and suppression are not the same, either in purpose or result, and courts of justice can tell the difference. * * *

"It is a nonsequitur to say that First Amendment rights may not be regulated because they hold a preferred position in the hierarchy of the constitutional guarantees of the incidents of freedom.

"This Court has never so held and indeed has definitely indicated the contrary. It has indicated approval of reasonable nondiscriminatory regulation by governmental authority that preserves peace, order and tranquility without deprivation of the First Amendment guarantees of free speech, press and the exercise of religion."

Having reviewed some of the many cases which are illustrative of the limitations upon the constitutional right of freedom of religion, we conclude with the generalization that, when called upon to do so, the courts are required to make accommodation between the constitutional guarantee of religious freedom and the exercise of state authority; and it is their duty to see to it that the most important interest will prevail.

Departing from such general considerations, we turn to the specific circumstances before us. Counsel for the plaintiff, in his oral argument, suggested that the police officers could have stayed outside the building—on the sidewalk or across the street. And if trouble developed, they could then have intervened. It appears likely, however, that if events had followed such a path, the officers might well have exposed themselves to a suit for damages by plaintiff, his followers, and others present for any injury, abuse, or mistreatment suffered.

Counsel have cited no case; and the Court has found none, which has treated with a factual situation such as confronts us here. As the Court sees it, the plaintiff's contention and claim amount to no more than an assertion that the United States Constitution confers upon him the right to conduct a public meeting—or a religious assembly —in a public place, with the public invited, free of police supervision except on terms prescribed by plaintiff or his faith. Plaintiff confuses restriction of religious action and practice with restriction of belief. What plaintiff sought to do in effect was to impose his tenets upon the police officers, and apparently make unwilling converts of them.

The defendant police officers were present at the meeting, as they should have been, to protect the plaintiff, his followers, and others in attendance. Religious liberty does not include the right to expose the public to possible breaches of peace, or disorder.

Whether the conduct of the officers is tested through the general police powers of the state, acting through the municipality and its officers, or by way of the ordinance of the City of Flint relied up-

on by the defendants, the result is the same:

"It cannot be said that such conduct was unreasonable, unduly oppressive or beyond the necessities of the case, and the means employed by the defendant police officers did have a real and substantial relation to the object sought to be attained —the maintenance of order. Three police officers can hardly be considered as too many for a potential gathering of six thousand, and the estimated turnout of twenty-five hundred, people."

The police had a right, yes, a duty, to be present at the gathering, in the interest of public order; and the plaintiff had no right to require them to accept his practices or beliefs in the name of religion. When government takes reasonable measures to insure public peace and order, they are not subject to veto, nullification or repeal by a religious order. The plaintiff has no cause for complaint.

The complaint of the plaintiff is dismissed, with costs to the defendants. An appropriate order may be presented.